Exh P

**Paula Dashiel**    Monday April 16, 2001 12:32 PM
International Services     203-926-2316     Fax Number: 203-926-2290

To:        Michael Cazalet/DG/Prudential@Prudential
           Deborah Kershaw/DG/Prudential@Prudential
cc:
Subject:   **Int'l Transportation Decision**



Confidential

Hello All,

First I want to say thankyou for asking me to reapply for the (ISC) ITC position.

However, after thinking I have decided that I am not interested in making a lateral
move at this time.

If any senior positions were to become available, I would be most interested to apply.

Many thanks for your time and consideration in this matter.

Kindest regards,

Paula Dashiel
International Services Coordinator
Prudential Relocation International
Phone: 203.926.2316
Fax: 203.926.2290
Email: Paula.Dashiel@Prudential.com

Exhibit Q

 Prudential

Prudential Relocation
Two Corporate Drive, Shelton, CT 06484-6238
Tel 203 925-8456

August 31, 2001

Paula Dashiel
Apt 516   60 Strawberry Hill Ave
Stamford, CT  06902

Dear Paula:

As you know, Prudential Real Estate and Relocation Services is undergoing a reorganization due to Project Firebird. This process is being undertaken so that Prudential Real Estate and Relocation Services can better serve its customers and operate more efficiently. As a result, your position is being eliminated. Therefore, you are being separated from employment effective October 31, 2001.

Of course, you may post for positions both inside and outside of Prudential Real Estate and Relocation Services. If you are unable to secure another position with Prudential, however, your separation from employment with Prudential will occur on October 31, 2001.

As a result of your separation from employment, you are eligible for the following benefits:

- A lump sum severance payment in accordance with the Prudential Severance Plan (the "Severance Plan") estimated to be $6,800.00, less applicable taxes, withholdings, and other deductions. Payment will be made as soon as practicable after your last day of employment, and the expiration of any applicable revocation period related to your signed Separation Agreement and General Release.

- If you elect to continue medical and/or dental coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), you will receive such coverage provided to similarly situated active employees at the Company-subsidized rates for 6 months (the "COBRA Subsidy"). The COBRA Subsidy will cease upon the expiration of the 6 months, or the date you obtain other employment, or the date you are eligible for other group medical and/or dental coverage, whichever occurs first. Thereafter, you shall be eligible for medical and/or dental coverage for the remainder of the COBRA period at the standard non-subsidized COBRA rates. (Note that COBRA rates change annually on January 1.)

- In accordance with the terms of your current compensation plan, and subject to the appropriate approvals, a prorated incentive payment in the amount of $500.00, less applicable taxes and withholdings, will be paid. This payment will be made as soon as practicable after your separation date and the expiration of any applicable revocation period related to your signed Separation Agreement and General Release.

- Outplacement services will be provided by Lee Hecht Harrison.

You will not be eligible for these benefits if any of the following occurs prior to your effective date of separation:

- You successfully post for another position within Prudential;

- You voluntarily terminate your employment with Prudential for any reason;

- You are offered another position with Prudential, whether you accept or decline the position; **or**

- Your employment is terminated for cause as defined in the Severance Plan.

If you are offered another position with Prudential and decline it, you may be eligible for a severance payment under the Severance Plan, provided the Company, in its sole discretion, determines that the position you decline is at a total compensation level (that is base salary plus annual bonus [for the calculation of your annual bonus in this context in accordance with Prudential's Severance Plan, please see your Human Resources Consultant] or the equivalent thereof) is more than 20% below your current total compensation level, and/or the commuting distance from the center of town in which you reside to the center of town where the new position is located is greater than 49 miles.

Please note that you will only be eligible for these benefits if you sign the attached Separation Agreement and General Release by your effective date of separation. If you do not sign, or if you revoke, the Separation Agreement and General Release, you will not receive the payment under the Severance Plan, the COBRA Subsidy, the incentive payment or the outplacement services and the letter will be null and void. Please submit the signed Separation Agreement and General Release to Rosemary Moreno at Two Corporate Drive, Shelton, CT 06484-6238 on your last day in the office. The release will not be accepted prior to that date.

You should be aware that if you are rehired by Prudential, the Company may, in its sole discretion, require you to return any or all amounts of severance that have been paid to you under the Severance Plan.

In addition, you will receive a lump sum payment for any earned, unused 2001 personal vacation days, including any days carried over from 2000. You will receive any applicable retention bonus, less applicable taxes and withholdings you may be eligible for within 30 day of your separation date.

If you have any questions, please contact me.

Paula, these types of decisions are always difficult, and the decision to eliminate your position was not undertaken without a great deal of consideration. Your past contributions to Prudential are appreciated by me and the entire Prudential management team.

Sincerely,

John O'Connell

## SEPARATION AGREEMENT AND GENERAL RELEASE

This is an Agreement between the undersigned employee and The Prudential Insurance Company of America, its affiliates and subsidiaries, and each of their successors and assigns (the "Company").

1.     I understand that my employment with the Company will terminate on October 31, 2001.

2.     In exchange for my promises in this Agreement, the Company will provide me with the benefits described in John O'Connell letter dated August 31, 2001 (the "August 31, 2001" Letter").

3.     I acknowledge that under the Company's policies and practices, I am not entitled to receive the benefits described in the August 31, 2001 Letter unless I sign this Agreement. I also acknowledge that other than the benefits described in the August 31, 2001 Letter, I am not entitled to any additional separation or severance benefits of any kind from the Company whether or not under a plan, program, policy or arrangement.

4. In exchange for the benefits described in the August 31, 2001 Letter, I waive, release and give up any claim I, my heirs, executors, administrators, successors and assigns may have against the Company and all of its subsidiaries and affiliates, their employee benefits plans and trustees, fiduciaries, and administrators of those plans and any of their present or past employees, officers, directors, agents, and contractors, and each of their predecessors, successors and assigns ("Prudential"), based on any event that has occurred before I sign this Agreement, or based upon my employment with the Company and/or my separation from employment, including but not limited to any claims for salary, bonuses, severance pay, vacation pay or any benefits under the Employee Retirement Income Security Act of 1974, as amended; any claims of sexual harassment or discrimination based upon race, color, national origin, ancestry, religion, marital status, sex, sexual orientation, citizenship status, pregnancy, medical condition or disability, under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans With Disabilities Act, Section 1981 of the Civil Rights Act of 1866, or any other federal, state, or local law prohibiting discrimination in employment; any claims of age discrimination under the Age Discrimination in Employment Act, or under any other federal, state, or local law prohibiting age discrimination; claims of breach of implied or express contract, breach of promise, misrepresentation, negligence, fraud, estoppel, defamation, infliction of emotional distress, violation of public policy, wrongful or constructive discharge, or any other employment-related tort; any claim for costs, fees, or other expenses, including attorneys' fees; and all claims under any other federal, state, or local law relating to employment, including the New Jersey Conscientious Employee Protection Act and the New Jersey Law Against Discrimination. This includes a waiver of claims that I know about and claims that I may not know about. However, I am not waiving, releasing or giving up any claim for workers' compensation benefits, vested pension or savings plan benefits, or any right to unemployment benefits that I may have.

5.      I agree that neither I, nor any non-governmental person, organization or other entity acting on my behalf, has in the past or will in the future file any lawsuit asserting any claim that is waived under Paragraph 4. If I break this promise and file a lawsuit making any claim waived in this Agreement, I will pay for all costs, including reasonable attorneys' fees, incurred by Prudential in defending against my claim. Furthermore, I give up my right to individual damages in connection with any administrative or court proceeding with respect to my employment with and/or termination of employment from the Company and if I am awarded money damages, I will assign to the Company my right and interest to such money damages. Notwithstanding the foregoing, this paragraph does not limit my right to challenge the validity of this Agreement in a legal proceeding under the Older Workers Protection Act, 29 U.S.C. 626 Section (f) with respect to claims under the Age Discrimination in Employment Act. This paragraph also is not intended to and shall not limit the right of a court to determine, in its discretion, that the Company is entitled to restitution, recoupment, or setoff of any payments made to me by the Company should this Agreement be found to be invalid as to the release of claims under the Age Discrimination in Employment Act. This paragraph also does not affect the Company's right to recover costs, including attorneys' fees, to the extent authorized under federal or state law.

6.      I have not and will not disclose the terms of this Agreement, that this Agreement exists, or that I received any payments from the Company to anyone except my attorney, my financial and other advisors, the IRS or other taxing authorities, or my immediate family (spouse, children, siblings, parents), or as required by law, or in response to an inquiry from any judicial, governmental, regulatory, or self-regulatory agency or organization or to any court presiding over any action challenging the validity of the Agreement under the Older Workers Protection Act. If I do disclose the terms of this Agreement to my immediate family or my attorney or to my financial and other advisors, I will advise them that they must not disclose the terms of this Agreement.

7.      I agree that I have not and will not in any way disparage Prudential, or make or solicit any comments, statements, or the like to the media or to others that may be considered to be derogatory or detrimental to the good name or business reputation of Prudential.

8.      I agree to return to the Company any and all documents, materials, records or other items in my possession or control belonging to Prudential or containing proprietary information relating to Prudential; to surrender to the Company any identification or credit cards, keys, telephones, equipment or other such items owned by the Company or within my possession; and to promptly reconcile any outstanding expense accounts.

9.      I agree that, except as may be required by law, I will not, directly or indirectly, disclose to anyone outside the Company, except with the Company's prior written consent on a case-by-case basis, any confidential or proprietary information concerning Prudential, including but not limited to confidential or proprietary information, processes, trade secrets, attorney work product and attorney-client communications, and documents and data prepared in anticipation of or in the course of complaints, charges, investigations, examinations or litigation in which Prudential is involved ("Confidential Information"). I also agree that I will not make use of any Confidential Information for my own purposes or for the benefit of anyone or any other entity other than the Company.

Nothing contained in this Agreement shall preclude me from discussing any matter concerning Prudential with any governmental regulatory or self-regulatory agency. Furthermore, I will cooperate with any governmental regulatory or self-regulatory agency that requests me to provide testimony or information regarding Prudential. If I am compelled to testify by a validly served subpoena in any legal proceeding or by regulatory authority, I will testify truthfully as to all matters concerning my employment with the Company.

10.    I agree that I shall not for a two year period following my separation from employment with the Company: (a) solicit or induce, either directly or indirectly, any employee of the Company to leave the employ of the Company, (b) take any action to assist any successor employer or any other entity, either directly or indirectly, in soliciting or inducing any employee to leave the employ of the Company, or (c) hire or employ, or assist in the hire or employment, either directly or indirectly, of any individual employed by the Company, within sixty days preceding that employee's hire by me or my successor employer. In addition, I agree that for a two-year period following my separation from employment with the Company not to on behalf of a competing organization, directly or indirectly, solicit, sell or accept business from any person or entity to whom I sold, serviced, or who became known to me during the course of my association with Prudential.

I agree that this non-solicitation arrangement is fair, and reasonable and necessary under the circumstances and is reasonably required for the protection of the Company. I also acknowledge that, in the event I breach any part of this paragraph, the damages to the Company would be irreparable. Therefore, in addition to monetary damages and/or reasonable attorney's fees, the Company shall have the right to seek injunctive and/or other equitable relief in any court of competent jurisdiction to enforce this covenant. Further, I consent to the issuance of a temporary restraining order to maintain the status quo pending the outcome of any proceeding.

11.    By making this Agreement, I acknowledge that Prudential does not admit that it has done anything wrong, and Prudential specifically states that it has not violated or abridged any federal, state, or local law or ordinance, or any right or obligation that it may owe or may have owed me.

12.    I understand and agree that the damage to Prudential due to any breach of this Agreement will be extremely difficult to determine. Therefore, I agree that if I violate this Separation Agreement and General Release, I will pay to the Company the value of the benefits described in the August 31, 2001 Letter, without prejudice to any additional relief that may be available to the Company. In addition, if I break my promise in paragraph 5 and file a lawsuit regarding claims I have released, I agree to pay for all costs incurred by the Prudential, including reasonable attorneys' fees, in defending against my claim. Notwithstanding the foregoing, this paragraph does not apply to my right to challenge the validity of this Agreement in a legal proceeding under the Older Workers Protection Act, 29 U.S.C. 626 Section (f) with respect to claims under the Age Discrimination in Employment Act and such a challenge shall not be considered a breach of this Agreement. This paragraph, however, is not intended to and shall not limit the right of a court to determine, in its discretion, that the Company is entitled to restitution, recoupment, or setoff of any payments made to me should this Agreement be found to be invalid as to the release of claims under the Age Discrimination in Employment Act. This paragraph also does not affect the Company's right to recover costs, including attorneys' fees, to the extent authorized under federal or state law.

13.    I agree to make myself available to and cooperate with the Company in any internal investigation or administrative, regulatory, or judicial proceeding. I understand and agree that my cooperation would include, but not be limited to, making myself available to the Company upon reasonable notice for interviews and factual investigations; appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process; volunteering to the Company pertinent information; and turning over all relevant documents which are or may come into my possession. I

understand that in the event the Company asks for my cooperation in accordance with this provision, the Company will reimburse me solely for reasonable expenses upon my submission of appropriate documentation.

14.     I understand that I have at least 45 days to review and consider this Agreement before signing it. I further understand that I may use as much of the 45 day period as I wish before signing this Agreement.

15.     I may revoke this Agreement after I sign it by delivering written notification to John O'Connell no later than the close of business seven days after I sign this Agreement. This Agreement will not become effective or enforceable until seven days after I sign it. If I revoke this Agreement, it will not be effective or enforceable and I will not receive the benefits described in the August 31, 2001 Letter.

16.     All individuals who will be separated from employment with the Company as a result of the restructuring will be eligible for benefits based upon their execution of a release. I have been informed of the time limits that apply to receipt of these benefits and have been provided with a document showing the job titles and ages of all individuals who will be eligible for benefits as a result of their separation from employment with the Company due to the restructuring, and the ages of all individuals in the same job classifications or organizational unit who are not being separated from employment with the Company due to the restructuring (Attachment A).

17.     I acknowledge that the Company advised me to consult with an attorney before signing this Agreement and that this Agreement gives me the opportunity and encourages me to have this Agreement reviewed by an attorney.

18.     This Separation Agreement and General Release and the August 31, 2001 Letter is the entire agreement between the Company and me. No other promises or agreements have been made to me other than those in this Agreement. In deciding to sign this Agreement, I have not relied on any statement by anyone associated with Prudential that is not contained in this Agreement or August 31, 2001 Letter.

19.     I agree that if any provision of this Separation Agreement and General Release is determined by a court to be illegal, invalid or unenforceable, that provision shall not be a part of this Separation Agreement and General Release. The legality, validity and enforceability of the remaining provisions shall not be affected by a determination that a provision of this Agreement is illegal, invalid or unenforceable.

20.    I acknowledge that I have carefully read this Agreement, fully understand what this Agreement means, and am signing this Agreement knowingly and voluntarily.


_____                    Date:_____
Paula Dashiel


_____
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

The Prudential Insurance Company of America


By: _____                    Date:_____


Title: _____

Attachment A

Certain positions in Prudential Real Estate and Relocation Services have been eliminated as a result of the relocation of PRERS operations and information technology to Phoenix, Arizona from Shelton, Connecticut; Chicago, Illinois; Atlanta, Georgia; Houston, Texas; Irvine, California; and Valhalla, New York. Individuals who will separate from the company as a result of these job eliminations are eligible for separation benefits. In order to receive benefits, eligible employees must separate from employment and return to PRERS an executed Separation Agreement and General Release.

The job titles, locations and ages of employees whose jobs were eliminated at this time, due to the relocation of Prudential Real Estate and Relocation Services to Phoenix, Arizona, and the job titles, locations and ages of employees in similar job classifications whose jobs were not eliminated are attached.

JE

August 31, 2001

Paula Dashiel
Two Corporate Drive, Shelton, CT 06484-6238

Dear Paula:

As we have explained, effective December 31, 2001, Prudential Real Estate and Relocation

Services ("PRERS") will close its facility located at Two Corporate Drive, Shelton, CT 06484-6238.

The position eliminations and employment terminations are expected to be of a permanent nature.

Accordingly, we are issuing you this letter to provide you with written notice as required under the

Worker Adjustment and Retraining Notification Act ("WARN")") in connection with this "plant closing,"

as WARN defines the term.

As a result of this plant closing, your employment will terminate on or about October 31, 2001.

You will be eligible to receive certain separation-related payments and benefits, provided you meet the

prerequisites and enter into a separation agreement and execute a general release and waiver of claims

relating to your employment. A description of the payments and benefits that you will be eligible to

receive and the aforementioned separation agreement and general release and waiver are attached to this

notice.

Employees effected by this plant closing will not have any bumping rights in connections with

these events.

If you have any questions or need additional information regarding the plant closing, please me at

(949) 749-7954.

Sincerely yours,    K iN

*Sharon Wright*

Sharon Wright
VP, Human Resources

Exhibit R



# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES
### FORM 103
## AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

DATE: _8/21/01_                    CASE NO. _0230126_

MY NAME IS: _Paula Stashick_

AND I RESIDE AT _60 Strawberry Hill Ave. Apt 516 Stamford, CT 0690_

THE RESPONDENT IS _renowned Real Estate and Rebuilding_

WHOSE BUSINESS ADDRESS IS _Two Corporate Drive, Shelton, CT 06484_

I Was:

( x )terminated
( )suspended
( )placed on probation
( )demoted
( )warned
( )given a poor evaluation
( )denied a raise
( )less trained
( )denied an office
( )denied service(s)
( )discriminated against in terms and conditions of employment

( )not hired/not promoted
( )not rented a dwelling
( )harassed  ( )sexually harassed
( )earning a different rate of pay
( )constructively discharged
( x )retaliated against
( )not hired due to a disability
( )delegated difficult assignments
( )other_____

on _3/30/01_ and believe that my

( )race
( )color
( )sex ( )male ( )female
( )previously opposed, filed or assisted
( )ancestry
( )age DOB
( )religion
( )pregnancy
( )alienage

( )national origin
( )martial arts
( )physical disability
( )mental retardation
( )mental disorder
( )religious creed
( )familial status
( )sexual orientation
( )lawful source of income

RECEIVED
STATE OF CONNECTICUT
SEP 18 2001
Comm. On Human Rights & Opportunities
WEST CENTRAL REGION

was in part a factor in this action. I believe that the respondent violated the following Connecticut General Statutes and acts listed below and ( ) enforced through Section 46a-58(a) (if applicable).

( x )46a-60(a)(1)
( )46a-60(a)(4)
( )46a-60(a)(7)( )( )( )
( )46a-60(a)(S)( )( )( )
( )46a-64c( )( )
( )46a-64a( )( )( )
( )46a-S1( )( )( )
( )46a-S0_____

( )Section 504 of the Rehabilitation Act
    of 1973, as amended.
( x )Title VII of the Civil Rights Act of 1964, as amended,
    42 U.S.C. 2000e and the Civil Rights Act of 1991 (cite
    for 15 individuals employed)
( )Age discrimination in Employment Act of 1967, 29
    U.S.C. 621-634 (cite for over 20 individuals employed)

    42, U.S.C. 12101 et seq.
( )Equal Pay Act of 1964, U.S.C.                ( )other_____

### AFFIDAVIT IN SUPPORT OF PAULA DASHIEL v. RESPONDENT
### PRUDENTIAL RELOCATION SERVICES

1.  I am over the age of 18 and believe in the obligations of an oath. The facts stated herein are true and correct to the best of my knowledge and belief. I am 28 years of age, born on November 14, 1972. I reside at 60 Strawberry Hill Avenue, Apt. 516, Stamford, Connecticut, 06902.

2.  I was hired by "Respondent" Prudential Relocation Services on September 7, 1999 as an International Services Coordinator for overseas relocation. Respondent is located at 2 Corporate Drive, Shelton, Connecticut, 06484.

3.  As an employee of Prudential Relocation Services, I was consistently rated as an excellent employee. I was presented with the Prudential Real Estate and Relocation Services APEX award for achieving performance excellence within the company in 2000. I was in the top rate for performance review bonus.

4.  During my employment with Respondent I was faced with organization isolation, alienation, lack of opportunity, the result of discrimination based on my race.

5.  In November 1999, I was informed that Respondent was relocating its facility to Phoenix, Arizona. Memos were distributed to the employees stating that those employees who were hired prior to the announcement will be entitled to a 10% stay on bonus until November 30, 2001.

6.  Respondent gave me a choice of two offers to continue in my employment with the company. In January 2001, Respondent presented me with the opportunity to relocate to Phoenix, Arizona and work at the new facility. In the alternative, Respondent presented me with the opportunity to work in its White Plains, New York office.

7.  Respondent rescinded its offer to relocate to Phoenix in a letter dated January 11, 2001. In this letter, Respondent stated that it had changed "its strategy" and that the offer process would be temporarily delayed. For that reason, Respondent's offer to relocate was "null and void" and any response to that offer will also be "null and void."

8.  Following that rescission, I received a phone call from Ms. Debra Kershaw asking me if I wanted to be considered for a job in the northeast. I responded in the affirmative.

9.  After receiving my past performance review, Ms. Kershaw once again called me, explaining that I had received very good reviews in the past and that she would like to have me as a part of her team. Ms. Kershaw said that a decision concerning those who

would be moving to the White Plains would be made in late February or early March 2001.

10. At about this time, present employees were informed that if they did not accept a position with Respondent's company within commutable distance from their home in the remaining northeast facilities their employment with Respondent would be terminated and no benefits will be made available to them. Commutable distance was defined by Respondent as within fifty (50) miles of an employee's residence.

11. Those employees who were not within commutable distance from their home to a remaining facility in the northeast would receive a severance package.

12. Respondent wanted six people for its White Plains, New York office. I was one of the existing employees being considered for that position. I was also told that since I was hired prior to March 2000, I would not have to reapply for the position. Another woman, Ms. Joan Schell, was also being considered for the White Plains office.

13. Ms. Schell performed a similar function at Respondent's company. She primarily worked in the transportation division. Ms. Schell lived in White Plains, New York, but commuted to the Shelton, Connecticut office because she did not get along with Mr. Mike Cazalet, Vice President of International Transportation. When Respondent announced that it was closing its Shelton, Connecticut office, Ms. Schell stated that she did not want to be considered for the White Plains, New York office. Despite being with the company for nine (9) years, Respondent stated that if she did not want to be considered, her employment with Respondent would be terminated.

14. Despite Respondent's rule that no severance package would be made available to employees within commutable distance from their homes, Ms. Kathleen Morris intervened and gave Ms. Schell a severance package.

15. I was supposed to hear a decision from Respondent regarding the White Plains, New York offer by April 15, 2001. An e-mail from Ms. Rosemary Moreno stated that my position within the company would be discussed on March 30, 2001.

16. At this meeting, Ms. Moreno explained that I was a "high breed" International Services Coordinator and as a result my position was being eliminated. Having never heard this term before, I asked Ms. Moreno exactly what is a "high breed" International Services Coordinator. Ms. Moreno stated that it is an individual who does destination services.

17. Despite my excellent performance reviews, I did not receive any offer for the White Plains, New York office, I later found out that Ms. Schell did not want to work with a "nigger." Though Ms. Schell was offered a position in the White Plains,

New York office she refused to take it because Ms. Debra Kershaw is African-American.

18. At first, Respondent refused to offer Ms. Schell a compensation package because she was turning down a position within Respondent's company that was within commutable distance from her residence. Ms. Schell responded to this with the threat of a lawsuit which prompted Respondent to offer Ms. Schell a severance package of thirty (30) weeks pay.

19. Despite being recommended by Ms. Kershaw for a position in the White Plains, New York office and receiving outstanding performance reviews I was not given a position in the White Plains, New York office.

20. I received a phone call from Ms. Morris explaining that the decision to not transfer me to the White Plains, New York office was not her fault and that she "was not thinking of my well-being when the decision was made."

21. Respondent hired new employees for the White Plains, New York office. The new hires were all white. Even though I had better credentials and more experience than any of the white new hires, I was not given a position in Respondent's White Plains, New York office.

22. I feel that the Respondent is in violation of Title VII for discriminating against me due to my race.

23. I feel that the Respondent is in violation of Title VII for subjecting me to continual disparate treatment based on my race.

24. I feel that the Respondent is in violation of the C.G.S. Sec. 46a-60a(1) for discriminating against me in compensation, terms, conditions, and privileges of employment due to my race.

I hereby request that the Commission investigate my complaint and order such relief and remedies, as it deems proper.

The foregoing is true and accurate.

Subscribed and Sworn before me.

On this 21st day of August 2001


*Christa E. Plackis, Esq.*

~~Notary Public~~

Commissioner of Superior Court

~~My Commission Expires~~:

Paula C. Dashiel

**IMPORTANT: YOU MUST OBTAIN A NOTARIZATON OF YOUR COMPLAINT BEFORE YOU RETURN IT**

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

*Paula Distifel* _____ being duly sworn, on oath, states that she/he is the Complainant herein; that she/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters she/he believes the same to be true.

Dated at _Woodbridge_, Connecticut this _10th_ day of _September_ _2001_.

_____
Complainant's Signature

Subscribed and sworn to before me this _10th_ day of _September_, ~~1999~~ 2001

_____
~~Notary Public/~~Commissioner of the Superior Court

_____
My Commission Expires

Exhibit S

State of Connecticut
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
55 West Main Street, Suite 210, Waterbury, CT 06702  (203) 805-6530  Fax (203) 805-6559
www.state.ct.us/chro
TDD (203) 805-6579

**FL407**

# MERIT ASSESSMENT - NOTICE OF MAR DISMISSAL

Certified No. 7060 0600 0 0286 363 9909

December 28, 2001

RECEIVED
JAN -3

Paula Dashiel
60 Strawberry Hill Ave.  Apt. 516
Stamford, Ct.  06902

Dear Ms. Dashiel:

RE:    NOTICE OF FINAL AGENCY ACTION
       CASE NO./NAME: 0230126 Dashiel v.  Prudential Relocation Services
       EEOC NO.  16aa134751

Notice is hereby given that pursuant to Section 46a-83(b) of C.G.S, the Commission has
processed your complaint through its Merit Assessment processes.

Further, you are hereby notified that as a result of these activities, your complaint has been
dismissed for the reason that it there is no reasonable possibility that further investigation will
result in a reasonable cause finding because:

- There no evidence to indicate that you were subjected to unequal terms and conditions of
  employment,  denied a transfer to another position or terminated due to your race or color.
- It is undisputed that you never complained of race or color discrimination in spite of the
  respondent's documented complaint policy and procedure.
- It is undisputed that your former position of International Services Coordinator was
  eliminated.
- Both you and Ms Schell, a Caucasian individual, were laid off due to that elimination and due
  to the fact that you both chose not to pursue the opportunity to fill the position of
  International Transportation Counselor in the Valhalla, N.Y. office.
- You yourself have admitted that you withdrew your application for that position.
- There is no dispute that the position of International Transportation Counselor is not identical
  to the position of International Services Coordinator.
- You yourself have indicated that  Mr. Reingold, held the position of  International
  Transportation Counselor at the time he was transferred.   Therefore, he was not similarly
  situated to you.
- There is no dispute that half of the positions you sought were given to individuals who are of

Form Letter 407
7/1/98

Revised

# CHRO

*Safeguarding Civil Rights in Connecticut*

Affirmative Action/ Equal Opportunity Employer

the same race and color as you.

• You did not provide any additional substantive information which might refute the response.

The complainant may apply for reconsideration, requesting that the Commission reconsider its decision dismissing the complaint, as provided in subsection (b) of Section 46a-83 of the C.G.S. (formerly Public Act 94-238). The reconsideration request must be in writing and **filed** at the Commission's administrative office stated on the letterhead **within fifteen (15) calendar days from the date of this letter**. It is the complainant's responsibility to file a timely request. No additional information after this fifteen (15) day period will be considered. Untimely requests will not be considered. The request should state specifically the grounds upon which the application is based. Generally, no new documentation or evidence can be considered as only documentation in the case file at the time of dismissal will be reviewed. Any request for reconsideration must be submitted to the regional office listed on the letterhead.

A copy of your request for reconsideration must be mailed to the respondent and respondent's attorney, if any, at the address listed at the bottom of this letter. You should certify that you have done so in your request for reconsideration filed with the Commission. **If you do not request reconsideration of the dismissal of your complaint, you will be issued a release of jurisdiction which grants you the right to file a civil action in Superior Court. Effective July 1, 2001, even if you do request reconsideration, a release of jurisdiction can be obtained by written request to the executive director if the reconsideration request has been pending over ninety (90) days, or if the request is made within fifteen (15) days of receipt of the notice granting or rejecting reconsideration.**

The complainant may appeal this disposition to the Superior Court of the State of Connecticut if reconsideration of the dismissal is requested and denied. Any appeal must strictly comply with all of the applicable statutory procedures, requirements, and time frames. You may wish to consult an attorney regarding the proper filing of an administrative appeal.

Sincerely,

Robert J. Brothers, Jr.
Acting Regional Manager

cc: Complainant's attorney: Eugene Axelrod
    Respondent's attorney: Sharyn B. Mandell
                           The Prudential Insurance Company of America
                           751 Broad St.
                           Newark, NJ 07102

Enclosures: Complainant(s)'/Respondent(s)' Certification of Mailing [Form #004]

Revised

Form Letter 407
7/1/98