different rate of pay," "denied a raise," "denied services," or "other." (Dashiel Dep. Ex. 15.)

Therefore, to the extent Dashiel's Title VII claim in Count One alleges race discrimination other

than PRERS' failure to select her for an ITC job in Valhalla or her termination, the Court lacks

jurisdiction over such claim because she failed to exhaust her administrative remedies.[2]

Accordingly, the Court should dismiss any such claim in Count One.

## C.     THE COURT SHOULD DISMISS COUNT ONE OF THE AMENDED COMPLAINT BECAUSE DASHIEL HAS NO EVIDENCE OF RACE DISCRIMINATION

In analyzing discrimination claims under Title VII, the evidentiary framework set out in

McDonnell Douglas Corp. v. Green, 411 U.S. at 792, must be followed. Scaria v. Rubin, 117

F.3d 652, 654-55 (2d Cir. 1997). Under the McDonnell Douglas analysis, Dashiel first bears the

burden of proving a *prima facie* case of race discrimination. 411 U.S. at 802. If Dashiel proves

a *prima facie* case, the burden shifts to Prudential to articulate "some legitimate,

nondiscriminatory reason" for its decisions. Id. Prudential's burden is simply one of articulation

or production; it is not a burden of proving the absence of a discriminatory motive. DiCola v.

SwissRe Holding (N. Am.), Inc., 996 F.2d 30, 32 (2d Cir. 1993). Prudential need "only produce

admissible evidence which would allow the trier of fact rationally to conclude that the

employment decision had not been motivated by discriminatory animus." Texas Dep't of

Community Affairs v. Burdine, 450 U.S. 248, 257 (1981).

Dashiel bears the "final burden" of "prov[ing] not only that the proffered

nondiscriminatory reason was pretextual *but also* that [Prudential] discriminated against [her]."

Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001) (emphasis added)

(citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)) cert. denied, 534

---

[2]     Moreover, to the extent that Dashiel's Title VII claim accrued more than 300 days before September 18, 2001 (*i.e.*, November 22, 2000), it is time-barred. 42 U.S.C. § 2000e-5(e).

U.S. 951 (2001); James v. New York Racing Ass'n, 233 F.3d 149, 156, 157 (2d Cir. 2000);

Choate v. Transport Logistics Corp., 234 F. Supp. 2d 125, 128 (D. Conn. 2002). "The ultimate

burden of persuading the trial of fact that [Prudential] intentionally discriminated against

[Dashiel] remains at all times with [her]." Burdine, 450 U.S. at 253.

"In the summary judgment context, the 'central question' is whether [Dashiel has]

'presented sufficient admissible evidence from which a rational finder of fact could infer that

more likely than not [that she was] the victim[] of discrimination, *i.e.*, that an impermissible

reason played a *determinative* role in the adverse decision." Griffin v. Ambika Corp., 103 F.

Supp. 2d 297, 307 (S.D.N.Y. 2000) (citation omitted; emphasis added); Moodie v. Federal

Reserve Bank of N.Y., 862 F. Supp. 59, 63 (S.D.N.Y. 1994), aff'd, 58 F.3d 879 (2d Cir. 1995).

More significantly, where, as here, the defendant goes beyond merely articulating a non-

discriminatory reason "'to substantiating that reason by proving that it has a sound and factually

supported basis, [Dashiel's] task of showing that this reason was a pretext will be more

difficult.'" Halbrook v. Reichhold Chems., Inc., 766 F. Supp. 1290, 1295 (S.D.N.Y. 1991)

(citation omitted), aff'd, 956 F.2d 1159 (2d Cir. 1992) (table). Where, as here, "the evidence of

discriminatory intent is so [nonexistent or] slight that no rational jury could find in plaintiff's

favor[,]" summary judgment is proper. Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 716

(2d Cir. 1994).

**1.    Dashiel Cannot Establish A *Prima Facie* Case Of
Race Discrimination In Connection With Her
Failure To Obtain An ITC Job And Her Termination**

In order for Dashiel to survive summary judgment with respect to her claim that she was

terminated because of her race, she must show that (1) she was denied a transfer to an open

position for which she had a pending application and (2) the decision not to give her that position

*and* terminate her employment occurred "under circumstances giving rise to an inference of discrimination." Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995); see also Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998); Fischer v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997) (*en banc*) (in a denial of transfer case, plaintiff must show "the ultimate filling of the position by a person not of the protected class"), cert. denied, 522 U.S. 1075, reh'g denied, 523 U.S. 1041 (1998).  Dashiel cannot prove either of these elements of her *prima facie* case.

### a.  Dashiel had no pending applications for another vacant position at the time of her termination

In discriminatory failure to hire or transfer cases, Second Circuit precedent "require[s] a plaintiff to allege that she . . . applied for a specific position or positions and was rejected therefrom[.]" Brown, 163 F.3d at 710; Carlson v. Principal Financial Group, 320 F.3d 301, 314 (2d Cir. 2003); see also Gonzalez v. Connecticut Dept. of Transportation, 151 F. Supp. 2d 174, 178, 180-81 (D. Conn. 2001) (granting summary judgment dismissing plaintiff's discriminatory failure to promote claim based on his race because he never submitted an application or arranged for an interview for position he sought).  At the time of her termination, however, Dashiel had no pending application for an open job at PRERS or Prudential.  (Def.'s 56(a)(1), ¶¶ 32, 36.)  Therefore, she cannot establish a *prima facie* case of race discrimination for this reason alone.

When Dashiel was notified that her ISC job in Shelton would be eliminated, she also was informed that her employment would be terminated effective October 31, 2001, *unless* she found another available position within PRERS or Prudential.  (Id., ¶¶ 23-25.)  Dashiel originally applied for an open ITC position in Valhalla, but then voluntarily withdrew her application for that position before Kershaw had chosen an applicant for the job.  (Am. Compl., ¶ 27; Def.'s 56(a)(1), ¶¶ 29, 32.)  After Dashiel withdrew her application for the ITC job, Kershaw no longer

12

considered Dashiel for that job. (Def.'s 56(a)(1), ¶ 32.) As Dashiel did not apply for any other

position prior to the termination of her employment, she did not have a pending application for

any job at the time of her termination. (Id., ¶¶ 32, 36.) Consequently, she cannot prove an

essential element of her *prima facie* case, and her race discrimination claim in Count One should

be dismissed.

      **b.**     **Dashiel was not terminated under circumstances**
              **giving rise to an inference of race discrimination**

     In order to raise an "inference of discrimination" with respect to her race discrimination

claim, Dashiel must "produce direct or circumstantial evidence that would lead a 'reasonable

fact-finder to conclude either . . . that [PRERS did not select her for the ITC job and discharged

her] because of [her race], or . . . [that PRERS] regarded [her race] as a negative factor in such

consideration." Passonno v. State Univ. of N.Y. at Albany, 889 F. Supp. 602, 607 (N.D.N.Y.

1995) (citations omitted). This Dashiel cannot do. Instead, she relies solely upon the fact that

she is African-American and that she was discharged. That, however, is not enough to raise "an

inference of discrimination" or withstand summary judgment. E.g., Williams v. Brooklyn Union

Gas Co., 819 F. Supp. 214, 225 (E.D.N.Y. 1993) ("[P]laintiff's age, standing alone, is

insufficient to satisfy his burden of proof."). As demonstrated by the following arguments and

undisputed facts in the record, Dashiel cannot remotely prove that she was not selected for the

ITC job in Valhalla or discharged under circumstances giving rise to an inference of

discrimination.

     First, Dashiel admits that Kershaw – who made the "sole" decision not to select Dashiel

for the ITC position in Valhalla – did not discriminate against her. (Def.'s 56(a)(1), ¶¶ 33-34.)

She also admits that she had a "very good" working relationship with Kershaw. (Id., ¶ 34.)

Those admissions are fatal to Dashiel's race discrimination claim. Grady v. Affiliated Cent.,

Inc., 130 F.3d 553, 561 (2d Cir. 1997) (affirming summary judgment dismissing age

discrimination claims where plaintiff was unable to point to any statement by the decision-maker

that related to her age), cert. denied, 525 U.S. 936 (1998); Duprey v. The Prudential Ins. Co. of

Am., 910 F. Supp. 879, 888 (N.D.N.Y. 1996) (granting summary judgment where plaintiff had

no evidence of discriminatory conduct by the two ultimate decision-makers who accepted and

approved her supervisor's recommendation to terminate her employment).

Second, Kershaw also is African-American, (Def.'s 56(a)(1), ¶ 30), which further negates

Dashiel's claim that she was discriminated against because of her race.  E.g., Booze v. Shawmut

Bank, 62 F. Supp. 2d 593, 598 (D. Conn. 1999) (dismissing race discrimination claim, stating

that plaintiff failed to demonstrate any "inference of discrimination, especially since the majority

of her disciplinarians were African-American," the same race as plaintiff); Pisana v. Merrill

Lynch & Co., 1995 U.S. Dist. LEXIS 10296, at *14 (S.D.N.Y. July 20, 1995) ("The fact that

these decision makers were close to Pisana's age, or older, weakens any suggestion of age

discrimination."); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997)

(finding it "highly unlikely" that a decision-maker in the same protected class would be

prejudiced against a member of that class).

Third, Martha Bobian, the person hired to fill the ITC job for which Dashiel originally

applied, also is African-American.  (Def.'s 56(a)(1), ¶ 35.)  This fact belies Dashiel's race

discrimination claim.  "The fact that the position which the plaintiff sought was filled by a

member of her same protected class undercuts her claim of racial discrimination." McCulley v.

So. Conn. Newspapers, 98 F. Supp. 2d 216, 223 n.4 (D. Conn. 2000); Fischer, 114 F.3d at 1335

(plaintiff must show "the ultimate filling of the position by a person not of the protected class");

Patino v. Rucker, 1996 WL 137481, at *3 (S.D.N.Y. Mar. 27, 1996) ("The District Courts in this

Circuit have consistently granted summary judgment in cases where the defendant replaced the plaintiff with someone in the same protected class."), aff'd, 122 F.3d 1057 (2d Cir. 1997) (table).

Fourth, in late-2001, four of the six ITCs in Valhalla were African American. (Def.'s 56(a)(1), ¶¶ 27, 28, 35.) This racial composition of the ITCs further negates any inference of race discrimination. Burbank v. Office of the Attorney General of the State of Connecticut, 240 F. Supp. 2d 167, 172 (D. Conn. 2003) (dismissing race-based failure to rehire claim relying on the fact that the majority number of individuals hired into the position for which plaintiff applied were the same race as plaintiff); Watt v. New York Botanical Garden, 2000 WL 193626, at *8 (S.D.N.Y. Feb. 16, 2000) (crediting fact that 2 of the 8 employees supervised by the decision-maker were Jamaican, like the discharged plaintiff); Cooperman v. Solil Management, Inc., 2000 WL 16929, at *6 (S.D.N.Y. Jan. 11, 2000) (viewing fact that 77% of persons in plaintiff's job title were in the same protected class is "substantial, uncontroverted evidence" that a discriminatory motive "was not a likely factor in the decision to terminate him").

Fifth, Dashiel cannot prove that she was treated differently than "similarly-situated" non-African-American employees. Martin v. Citibank, N.A., 762 F.2d 212, 217 (2d Cir. 1985); Diggs v. Town of Manchester, CT, 303 F. Supp. 2d 163, 178 (D. Conn. 2004) (plaintiff failed to show that he was treated differently than similarly-situated employees of a different race). Here, the record shows that Dashiel's employment was terminated when her job was eliminated and she failed to obtain another position within PRERS or Prudential. (Def.'s 56(a)(1), ¶¶ 16, 19-20, 23, 36.) That also was true for Schell, who is Caucasian and held the same ISC job title as Dashiel in the Shelton facility. (Id., ¶¶ 16, 19, 32.) Similarly, *over 400* employees in Shelton lost their jobs when that facility was closed, (id., ¶ 20), which further shows that PRERS did not single out Dashiel for termination. Moreover, individuals who were interested in an ITC job in

15

Valhalla had to apply and be selected for that position, (id., ¶ 19), which also shows that this was not a requirement that was imposed upon Dashiel only.

Sixth, the fact that Prudential hired Dashiel in the first place – obviously knowing that she is African-American – negates any inference of race discrimination. Burbank, 240 F. Supp. 2d at 172 (finding no inference of race discrimination where discharged plaintiff seeking rehire was a member of protected class when he was hired); Duprey, 910 F. Supp. at 886-87 (granting summary judgment dismissing disability discrimination claim and emphasizing that Prudential would not have hired plaintiff in the first place if it harbored discriminatory animus against disabled people); Suttell v. Manufacturers Hanover Trust Co., 793 F. Supp. 70, 74 (S.D.N.Y. 1992) (dismissing age discrimination claim, stating: "Suttell was hired by the Bank at the age of fifty-six, a fact which undercuts any inference of age discrimination").

Finally, the CHRO investigated Dashiel's race discrimination complaint and concluded that it was without merit. (Def.'s 56(a)(1), ¶ 40.) The CHRO's determination, which was adopted by the EEOC, (id., ¶ 40), is compelling evidence that Prudential did not discriminate against Dashiel. See Bawa v. Brookhaven Nat'l Lab., CV-95-2472 (LDW), slip op. at 15 (E.D.N.Y. Oct. 15, 1997) (copy attached to Cerasia Decl. as Ex. H) (relying on state agency determination of "no probable cause" in granting summary judgment dismissing discrimination claims), aff'd, 201 F.3d 430 (2d Cir. 1999) (table); Plummer v. Western Int'l Hotels Co., 656 F.2d 502, 505 (9th Cir. 1981) ("An EEOC determination, prepared by professional investigators on behalf of an impartial agency, has been held to be a highly probative evaluation of an individual's discrimination complaint."); Balletti v. Sun-Sentinel Co., 909 F. Supp. 1539, 1545 (S.D. Fla. 1995) (findings and conclusions by state agencies are admissible and appropriate in determining whether employee was discriminated against by employer); Wade v. New York Tel.

Co., 500 F. Supp. 1170, 1178 (S.D.N.Y. 1980) (relying upon EEOC's "no reasonable cause" finding in concluding that plaintiff failed to prove discriminatory discharge claim).

For each of these reasons, Dashiel cannot establish a *prima facie* case of race discrimination in connection with her failure to obtain an ITC job in Valhalla or her termination. Therefore, the Court should grant summary judgment dismissing Count One.

**2. The Record Indisputably Demonstrates That PRERS Had Legitimate, Non-Discriminatory Reasons For Not Selecting Dashiel For The ITC Job In Valhalla And For Terminating Her Employment**

Even if Dashiel could prove a *prima facie* case, which she cannot do, the record indisputably demonstrates that PRERS had legitimate, non-discriminatory reasons for not selecting Dashiel for the ITC job in Valhalla and for terminating her employment in October 2001. First, with respect to the ITC job, Dashiel voluntarily withdrew her application after she applied and interviewed for that job. (Def.'s 56(a)(1), ¶¶ 29, 32.) Once Dashiel withdrew her application and took herself out of the running for the ITC position, Kershaw – the sole decision-maker – no longer considered her for the position. (Id., ¶¶ 32-33.) Accordingly, it was Dashiel's own conduct — *i.e.*, withdrawing the application — that precipitated Kershaw's decision not to consider and, ultimately, not select Dashiel for the ITC job in Valhalla. See Gonzalez, 151 F. Supp. 2d at 180-82 (dismissing race discrimination claim where plaintiff voluntarily chose not to submit formal application for the job position he sought).

Second, Dashiel was terminated, along with over 400 other employees, when the Shelton facility closed due to a reorganization of PRERS' international division and she failed to obtain another job. (Def.'s 56(a)(1), ¶¶ 2, 20, 36-37.) When a corporation engages "mass firings" during the course of a relocation, such layoffs "undermine, rather than support, [a] plaintiff's claim of individual discrimination." Parcinski v. The Outlet Co., 673 F.2d 34, 36 (2d Cir. 1982)

(concluding that the loss of jobs after employer was acquired and the acquiring company engaged in "essential corporate belt-tightening" is a legitimate reason) cert. denied, 459 U.S. 1103 (1983); see also Graham v. TexasGulf, Inc., 662 F. Supp. 1451, 1460-61 (D. Conn. 1987) (discrimination claims are rebutted by proof that defendant underwent a reduction in force), aff'd, 842 F.2d 1287 (2d Cir. 1988); Gilyard v. S.C. Dep't. of Youth Servs., 667 F. Supp. 266, 269 (D.S.C. 1985) (work force reduction resulting from a consolidation is a legitimate reason for termination).

### 3.  Dashiel Has Absolutely No Evidence Of Pretext Or That The Real Reason She Was Not Selected For The ITC Job In Valhalla Or For Her Termination Was Her Race

Dashiel bears the "final burden" of "prov[ing] not only that the proffered nondiscriminatory reason was pretextual *but also* that [PRERS] discriminated against [her]." Slattery, 248 F.3d at 91 (emphasis added); James, 233 F.3d at 156, 157; Choate, 234 F. Supp. 2d at 128. For the reasons demonstrated above with respect to her *prima facie* case, Dashiel cannot carry this burden. Indeed, the undisputed facts show that she has absolutely no evidence that PRERS' reasons for not selecting her for the ITC job in Valhalla or for terminating her employment were false, let alone that the real reason for those decisions was her race. See supra pages 11-17.

In the end, Dashiel's only purported "evidence" of race discrimination is her mere disagreement with PRERS' business decision to terminate her employment (as well as over 400 other employees) when the Shelton facility closed in October 2001, and its decision that all Shelton employees interested in the ITC position in Valhalla were required to apply for that position. Dashiel's mere disagreement with PRERS' legitimate, business decisions is insufficient to defeat summary judgment. "'Federal Courts are not in the business of

18

adjudicating whether employment decisions are prudent or fair.  Instead, [their] sole concern is

whether unlawful discriminatory animus motives a . . . decision.'"  Luxenberg v. The Guardian

Life Ins. Co. of Am., 2004 U.S. Dist. LEXIS 3121, at *22-23 (S.D.N.Y. Mar. 2, 2004) (quotation

omitted); Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2001) ("'the court's role is to prevent

unlawful [employment] practices, not to act as a superpersonnel department that second guesses

employers' business judgments"); Scaria, 117 F.3d at 654-55 ("This Court does not sit as a

super-personnel department that reexamines an entity's business decisions.'") (quoting Dale v.

Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)); Norton v. Sam's Club, 145 F.3d 114,

120 (2d Cir.) (the law "does not make employers liable for doing stupid or even wicked things"),

cert. denied, 525 U.S. 1001 (1998).  That is because the issue in a discrimination case is "not

whether the basis on which the employer acted was sound; it is whether that basis was lawful."

Cianfrano v. Babbitt, 851 F. Supp. 41, 48 (N.D.N.Y. 1994) (the employer's reasons may be "a

good reason, a bad reason, a reason based on erroneous fact, or . . . no reason at all, as long as its

action is not for discriminatory reasons") (citation omitted); Powell v. Syracuse Univ., 580 F.2d

1150, 1156-57 (2d Cir.) ("the law does not require . . . that employment be rational, wise or well-

considered — only that it be nondiscriminatory), cert. denied, 439 U.S. 984 (1978).

Accordingly, Dashiel has given the Court no choice but to dismiss her Title VII race

discrimination claim in Count One.

## D.    DASHIEL'S BREACH OF IMPLIED CONTRACT CLAIM IN COUNT TWO FAILS BECAUSE HER EMPLOYMENT WAS TERMINABLE AT WILL

In Count Two of the Amended Complaint, Dashiel alleges that PRERS breached an

implied contract.  Specifically, Dashiel alleges that PRERS, "by its words, conduct and actions,"

represented that it would transfer her to another PRERS' facility.  (Am. Compl., ¶¶ 37-45.)

Stated otherwise, Dashiel contends that, through alleged representations made by PRERS, she

was entitled to a job transfer and should not have been terminated. Dashiel, however, admitted that she does not have any evidence to rebut the fact that she was an employee-at-will or to demonstrate that her at-will employment relationship was altered in any way. (Def.'s 56(a)(1), ¶ 5.) That admission is fatal to her claim.

It is well-settled under Connecticut law that purported contracts for permanent or continued employment are terminable at will. Rose v. James River Paper Co., 2 F. Supp. 2d 245, 254 (D. Conn. 1998) (citing Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 15 (1995)); Pace v. Bristol Hosp., 1994 Conn. Super. LEXIS 2974, at *4 (Conn. Super. Nov. 4, 1994). Under exceptional circumstances, an employment at-will status may be changed by an express or implied contract between the parties. Rose, 2 F. Supp. 2d at 254; see Carbone v. Atlantic Richfield Co., 204 Conn. 460, 471 (1987). Nonetheless, even in those cases, "[a] contract implied in fact, like an express contract, depends on an actual agreement." Coelho v. Posi-Seal Int'l, Inc., 208 Conn. 106, 111 (1988). Consequently, the plaintiff must prove that the defendant "agreed, either by words or action or conduct, to undertake [some] form of actual contractual commitment" to discharge the plaintiff only for cause. Id. at 112; Rose, 2 F. Supp. 2d at 254. Thus, "[t]o survive a motion for summary judgment, [Dashiel has] the burden of presenting evidence that [PRERS] has agreed to some form of contractual commitment. A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds of the parties.'" Rose v. Panolam Indus. Int'l Inc., 301 F. Supp. 2d 239, 245 (D. Conn. 2004) (quoting Burnham v. Karl & Gelb, P.C., 50 Conn. App. 385, 388-89 (1998)). Dashiel has not come close to meeting this burden.

Dashiel does not have any evidence showing that PRERS made oral or written statements giving rise to contract liability, or conducted itself in such a way as to change her at-will status of

employment. Dashiel admits that she knew as early as March 2001 that her job was being eliminated and that, if she did not secure another job within PRERS or Prudential, her employment would be terminated. (Def.'s 56(a)(1), ¶¶ 16, 21, 23-24.) Significantly, she admits that, between September 1999 and the end of her employment on October 31, 2001, no one at PRERS ever told her that she was guaranteed employment with PRERS for any specific period of time; nor did she ever receive anything in writing from PRERS guaranteeing her employment for a specific period of time. (Id., ¶ 5.) These admissions defeat her implied contract claim.

In addition, the documents Dashiel received throughout the course of her employment clearly belie any such claim:

- **September 7, 1999 Acceptance Letter**: On September 7, 2001, Dashiel signed an acceptance letter acknowledging that she was an "at will" employee: "I understand that my employment with Prudential Real Estate and Relocation Services is at will and either I or Prudential Real Estate and Relocation Services may terminate my employment at any time with or without reason and without prior notice." (Id., ¶ 3.)

- **Employee Handbook:** When Dashiel was hired, she received Prudential's Employee Handbook, which clearly states: "None of the company's policies, procedures or practices, whether expressed here or elsewhere, whether orally or in writing, are intended to create any promises or contractual rights of employment. This applies to privileges and benefits as well. . . . Your employment with the company is at will. This means that either you or the company may terminate the employment relationship at any time with or without cause, without prior notice." (Id., ¶ 4.)

- **January 1, 2001 Letter**: In the January 1, 2001 letter, PRERS offered Dashiel an opportunity to transfer to its Phoenix, Arizona facility. (Id., ¶ 8.) However, PRERS did not represent that she was being offered employment for a definite period of time. (Id.) Moreover, PRERS' offer did not alter Dashiel's at-will employment relationship: "This letter does not constitute an employment contract and does not guarantee your employment for any specific period of time. Your employment at Prudential continues to be at-will." (Id., ¶ 9.)

- **January 11, 2001 Letter:** In the January 11, 2001 letter, PRERS rescinded its offer to transfer Dashiel to Phoenix, Arizona. (Id., ¶ 11.) That letter notified Dashiel that the former offer was "null and void" and informed her that, once PRERS "finalized the business strategy," it would "communicate [to her] the next steps and where applicable distribute new offer letters." (Id., ¶¶ 11-13.) Thus, again, PRERS made no representation of continued employment.

- **August 31, 2001 Letter:** On August 31, 2001, Prudential formally notified Dashiel that her ISC job position was being eliminated and her employment terminated, effective October 31, 2001, upon the closure of the Shelton facility. (Id., ¶ 26.) The letter also explained the terms and conditions of Dashiel's separation, including, but not limited to, eligibility for a severance package and retention bonus and her eligibility to "post for positions both inside an outside of Prudential Real Estate and Relocation Service." (Id.) The letter specifically informed Dashiel that her separation from employment with PRERS would occur on October 31, 2001, "[i]f [she was] unable to secure another position with Prudential." (Id.) Thus, the August 31, 2001 letter put Dashiel on clear notice that her termination was forthcoming and that there would be an application process to obtain another position with PRERS or Prudential, thereby undermining any argument that she was entitled to continued employment.

Even if the Court were to find that an implied contract existed, which Prudential emphatically denies, Dashiel has no evidence that Prudential breached such a contract. That is because Dashiel's job was eliminated due to a reduction in force in connection with the closure of the Shelton facility, and Dashiel voluntarily withdrew her application for the ITC position in the Valhalla facility, taking herself out of consideration for that job, (id., ¶¶ 2, 7, 16, 23, 32; Am. Compl., ¶ 38). Coelho, 208 Conn. at 120 (holding that a reduction of force can be considered "just cause" for termination).

Moreover, Dashiel has no evidence showing that there was "a meeting of the minds" between her and PRERS regarding the existence of any contractual relationship, which is required to defeat summary judgment here. See Panolam Indus., 301 F. Supp. 2d at 245 (dismissing implied contract claim where plaintiff failed to prove that there was a "meeting of the minds between plaintiff and defendant regarding the existence of an employment contract").

For each of these reasons, the Court should dismiss Dashiel's breach of an implied contract claim in Count Two of the Amended Complaint.

E.    **THE COURT SHOULD DISMISS DASHIEL'S PROMISSORY ESTOPPEL CLAIM IN COUNT THREE BECAUSE SHE CANNOT ESTABLISH THAT PRERS MADE A CLEAR AND DEFINITE PROMISE UPON WHICH SHE RELIED, THAT SHE INCURRED AN INJURY, OR THAT SHE EXERCISED DUE DILIGENCE TO LEARN THE TRUTH OF THE PURPORTED REPRESENTATIONS**

In Count Three of the Amended Complaint, Dashiel asserts a promissory estoppel claim. Specifically, she alleges that PRERS made several "promises" to transfer her to another PRERS facility prior to her termination and that she "relied" on these promises "to her detriment," having "refrained from seeking other employment and declined other employment." (Am. Compl., ¶¶ 46-53.) The record shows that Dashiel has no proof to support this claim.

Connecticut courts recognize the doctrine of promissory estoppel as it is set forth in the Restatement (Second) Contracts § 90. Tutko v. James River Paper Co., 1998 U.S. Dist. LEXIS 20664, at *19 (D. Conn. Nov. 12, 1998), aff'd, 199 F.3d 1323 (2d Cir. 1999); D'Ulisse-Cupo v. Board of Directors of Notre Dame High Sch., 202 Conn. 206, 213 (1987). Section 90 of the Restatement (Second) Contracts states:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Restatement (Second) Contracts § 90 (1982).

1.    **Dashiel Cannot Establish That PRERS Made A "Clear and Definite Promise"**

The first essential element of promissory estoppel is the "existence of a clear and definite promise which a promisor could reasonably expected to induce reliance." D'Ulisse-Cupo, 202 Conn. at 213. A representation does not invoke a cause of action for promissory estoppel unless it is "sufficiently promissory [or] sufficiently definite to support contractual liability." Id. at 214

(holding that oral promises to a non-tenured teacher that she would be rehired were not sufficiently definite to support plaintiff's claim of promissory estoppel).

Dashiel cannot establish that PRERS made any representation to her constituting a "clear and definite promise" which would support contractual liability. As demonstrated above, Dashiel admits that no one at PRERS ever promised or guaranteed her continued employment. (Def.'s 56(a)(1), ¶ 5.) Further, Dashiel's acknowledgement of her "at will" status in the September 7, 1999 acceptance letter, as well as the language in the Employee Handbook and the January 1, 2001, January 11, 2001 and August 31, 2001 letters that PRERS sent to her, clearly prove that Dashiel's employment with PRERS was "at will." (Id., ¶¶ 3-4, 9, 11-13.) Indeed, these documents specifically disclaimed any guarantee of employment for a definite period of time. (Id.)

For these reasons, Dashiel cannot prove that Prudential made a clear and definite promise that would support contractual liability. Accordingly, the Court should dismiss Count Four.

### 2.    Dashiel Cannot Establish That She Relied On Any Promise To Her Detriment

Even if Dashiel could prove that Prudential made a clear and definite promise to her, she still cannot prove her promissory estoppel claim because she cannot show detrimental reliance. In order to invoke promissory estoppel, the promisee "must change [her] position in reliance" on the promise and, as a result, incur "some injury." Chotkowski v. State of Connecticut, 240 Conn. 246, 266 (1997); see also Tutko, 1998 U.S. Dist. LEXIS 20664, at *20-21 (holding that, notwithstanding whether statements in an employee publication could be considered sufficiently definite to support plaintiff's promissory estoppel claim, plaintiff failed to establish that he relied on any promises to his detriment); Economu v. Borg-Warner Co., 829 F.2d 311, 314-15 (2d Cir. 1987) (upholding district court's ruling that promissory estoppel claim must fail where plaintiff

failed to "show neither a 'clear and unambiguous promise' upon which he could reasonably and foreseeably rely, nor any pecuniary loss").

Dashiel testified that, in or around July 2001, she interviewed with one prospective employer only (Interconex), but that she did not receive a job offer.  (Def.'s 56(a)(1), ¶ 45.)  She also testified that she does not recall receiving any interviews (other than Interconex) or job offers from any prospective employers while she was employed by PRERS.  (Id.)  These admissions undermine any claim that Dashiel "relied" to her detriment upon the alleged representations by PRERS, let alone how this allegedly caused her injury.  Most notably, because Dashiel's employment was clearly terminable at will, she cannot allege any justifiable reliance on any purported promise of continued employment.

**3.    Dashiel Cannot Establish That She
       Exercised Due Diligence To Know The
       Truth Of The Purported Representations**

Finally, "[i]t is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things, but also lacked any reasonably available means of acquiring knowledge." Chotkowski, 240 Conn. at 268 (citations omitted); Tutko, 1998 U.S. Dist. LEXIS 20664, at *21 (holding that the "evidence fails to establish that [plaintiff] attempted to learn of the circumstances under which [defendant] could terminate him, or that he lacked the means to acquire such knowledge"). Here, Dashiel does not even allege to have exercised any due diligence to know the truth of the purported (unspecified) promises and representations made by PRERS — alleged representations which are flatly contradicted by her deposition testimony, the acceptance letter she signed, and the language in the Employee Handbook and letters she received from PRERS.  Nor does she allege that she lacked any reasonably available means of acquiring knowledge of the truth. See

25

Chotkowski, 240 Conn. at 268; Tutko, 1998 U.S. Dist. LEXIS 20664, at *21.  Under these

circumstances, the Court should dismiss Dashiel's promissory estoppel claim in Count Three.

**F.    THE COURT SHOULD DISMISS DASHIEL'S CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BECAUSE SHE HAD ADEQUATE STATUTORY REMEDIES TO ADDRESS HER ALLEGATIONS OF RACE DISCRIMINATION**

In Count Four of the Amended Complaint, Dashiel alleges that Prudential breached an

"implied covenant of good faith and fair dealing" when it allegedly represented that it would

transfer her to a new position in another PRERS facility and then failed to do so.  (Am. Compl.,

¶¶ 54-58.)  The Court should dismiss Count Four because Dashiel had adequate statutory

remedies to address her allegations of race discrimination.

To establish a breach of implied covenant of good faith and fair dealing claim where, as

here, the employment is terminable at will, Dashiel must demonstrate that her "dismissal was for

a demonstrably improper reason, the impropriety of which is derived from a violation of some

important public policy." Rose, 2 F. Supp. 2d at 255; Johnson v. Chesebrough-Pond's USA

Co., 918 F. Supp. 543, 550 n.4 (D. Conn.), aff'd, 104 F.3d 355 (2d Cir. 1996); Tutko, 1998 U.S.

Dist. LEXIS 20664, at *22.  It is not enough for a plaintiff to "point to an important public

policy." Rose, 2 F. Supp. 2d at 255.  Rather, "a plaintiff bringing a claim for violation of the

implied covenant of good faith and fair dealing must also establish that [she] does not otherwise

have an adequate means of vindicating that public policy." Id.; Bennett v. Beiersdorf, Inc., 889

F. Supp. 46, 49 (D. Conn. 1995); Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643, 648

(1985).  This Dashiel cannot do.

Dashiel alleges that she was discriminated against based on her race, in violation of Title

VII.  That is an insurmountable obstacle to her breach of an implied covenant claim: "the

statutory remedies for race discrimination in employment are sufficiently well developed to

26

preclude an independent cause of action" for breach of an implied covenant of good faith and fair

dealing. Bennett, 889 F. Supp. at 49. In other words, because Dashiel had adequate statutory

remedies available to her, the implied covenant of good faith and fair dealing claim in Count

Four should be dismissed. Id.; Rose, 2 F. Supp. 2d at 255 (dismissing implied covenant of good

faith and fair dealing claim because plaintiff had an adequate remedy under the ADEA).

**G.    THE COURT SHOULD DISMISS DASHIEL'S IIED CLAIM BECAUSE
THE ALLEGED CONDUCT IS NOT EXTREME AND OUTRAGEOUS
AND SHE HAS NO PROOF OF INTENT OR "SEVERE DISTRESS"**

In support of her IIED claim in Count Five of the Amended Complaint, Dashiel alleges

that she was not allowed to attend certain meetings, was not afforded equal pay and was

"hollered" at and/or "humiliated" by certain supervisors. (Am. Compl., ¶ 60.) The Court should

dismiss Dashiel's IIED claim because she cannot prove that the alleged conduct was "extreme

and outrageous" as a matter of law, that PRERS intended to inflict severe distress on her, or that

she has suffered "mental distress of a very serious kind."

In order to prove her IIED claim under Connecticut law, Dashiel must demonstrate that

"(1) [Prudential] intended or knew that emotional distress would likely result from its conduct;

(2) [Prudential's] conduct was extreme and outrageous; (3) [Prudential's] conduct caused

[Dashiel] distress; and (4) [Dashiel's] distress was severe." Panolam Indus., 301 F. Supp. 2d at

247 (citing Appleton v. Board of Educ. of Stonington, 254 Conn. 205, 210 (2000)). Conduct is

"extreme and outrageous" *only if* it exceeds "all bounds usually tolerated by a decent society, or

a nature which is especially calculated to cause, and does cause, mental distress of a very serious

kind." Petyan v. Ellis, 200 Conn. 243, 254 n.5 (1986); White v. Martin, 23 F. Supp. 2d 203, 208

(D. Conn. 1998), aff'd, 198 F.3d 235 (2d. Cir. 1999). Stated otherwise, "the conduct has [to be]

so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
Panolam Indus., 301 F. Supp. 2d at 247 (citations omitted).  It must cause "an average member
of the community . . . to exclaim, Outrageous!"  Appleton, 254 Conn. at 210-11.  Conduct that is
"merely insulting or displays bad manners or results in hurt feelings is insufficient" to prove
IIED.  Id.; Brown v. Ellis, 40 Conn. Super. 165, 167 (Conn. Super. 1984) ("Mere insults,
indignities, or annoyances that are not extreme or outrageous will not suffice.").  The
determination of whether conduct is sufficiently outrageous to be actionable should be made by
the Court.  Kintner v. Nidec-Torin Corp., 662 F. Supp. 112, 114 (D. Conn. 1987); Reed v.
Signode Corp., 652 F. Supp. 129, 137 (D. Conn. 1986); Appleton, 254 Conn. at 210.

     Here, the conduct alleged in the Amended Complaint, (see, e.g., Am. Compl., ¶¶ 60-65),
simply does not meet the stringent standard required under Connecticut law to prove an IIED
claim.  E.g., Panolam Indus., 301 F. Supp. 2d at 248 (dismissing IIED claim where supervisor
allegedly told plaintiff that she did not speak proper English, used profanity and moved plaintiff
to a cubicle in an area with heavier traffic, and where co-workers allegedly followed plaintiff
around the office and searched her desk); White, 23 F. Supp. 2d at 208 (dismissing IIED claim
because allegations that defendants harassed, disciplined and failed to promote a nurse due to his
gender and sexual orientation fell short of conduct so egregious as to exceed "all bounds usually
tolerated by a decent society"); Appleton, 254 Conn. at 211-12 (dismissing IIED claim where
plaintiff subjected to condescending comments and psychiatric evaluations, escorted off
employer's premises by police and forced to resign); Petyan, 200 Conn. at 253-54 (dismissing
IIED claim where physician put an allegedly libelous statement on an employment security
division form because such alleged conduct "could not be considered outrageous"); Carmonella
v. Walsh, 75 Conn. App. 319, 331-33 (2003) (no IIED claim where plaintiff falsely accused of

embezzlement, forced to sign resignation and release forms); Bator v. Yale-New Haven Hosp., 73 Conn. App. 576, 577-79(2003) (dismissing IIED claim where plaintiff subjected to rude treatment and false accusations, unfairly disciplined and warned, paid less than others in his position, and told to seek psychiatric help and attend anger management classes).  For all of the policy reasons set forth in Perodeau v. City of Hartford, CT, 259 Conn. 729, 756-63 (2002), it is particularly important in the employment context that the tort of IIED remain narrowly circumscribed.

Moreover, Dashiel has no evidence that PRERS knew or intended that its elimination of her job or its termination of her employment (as well as the termination of over 400 other employees) upon the closure of the Shelton facility would cause Dashiel severe distress. DeLaurentis v. City of New Haven, CT, 220 Conn. 225, 267 (1991) ("It is the intent to cause injury that is the gravaman of the tort.") (quoting Hustler Magazine v. Falwell, 485 U.S. 46, 53 (1988)).  Nor can Dashiel show that she, in fact, suffered "mental distress of a very serious kind" as a result of PRERS' failure to select her for the ITC job or its decision to terminate her employment.  See Peytan, 200 Conn. at 254 n.5.

For each of these reasons, the Court should dismiss Dashiel's IIED claim in Count Five of the Amended Complaint.

## H.    DASHIEL CANNOT PROVE HER NEGLIGENT MISREPRESENTATION CLAIM

In Count Six of the Amended Complaint, Dashiel again alleges that Prudential represented to her that it would select her for a job in another PRERS' facility and not terminate her employment, and that it made those representations without exercising "reasonable care or competence."  (Am. Compl., ¶¶ 66-74.)  She also claims that she relied on PRERS' alleged

misrepresentations to her detriment. (Id., ¶¶ 68-74.) Dashiel has absolutely no evidence to support this claim and it should be dismissed.

The governing principles of Connecticut's common law claim for negligent misrepresentation are set forth in § 552 of the Restatement Second of Torts (1979):

> One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

D'Ulisse-Cupo, 202 Conn. at 217-18 (1987); Giametti v. Inspections, Inc., 76 Conn. App. 352, 363 (2003). Accordingly, to survive summary judgment, Dashiel must show that (1) PRERS made a misrepresentation and (2) she justifiably relied upon that misrepresentation. Citino v. Redevelopment Agency, 51 Conn. App. 262, 273-75 (1998). She cannot show either of these elements, which is fatal to her claim.

First, Dashiel admits that, at no time did anyone from Prudential or PRERS – verbally or in writing — make *any representation* — let alone a *mis*representation — of continued employment. (Def.'s 56(a)(1), ¶ 5.) On that ground alone, her negligent misrepresentation claim must fail. Second, as demonstrated above, the September 7, 1999 acceptance letter, the Employee Handbook and 2001 letters Dashiel received from PRERS belie any argument that PRERS or Prudential made any representations of continued employment upon which Dashiel is basing this claim or that she justifiably relied on such representations. Accordingly, the Court should dismiss Count Six of the Amended Complaint.

I.    **DASHIEL'S PURPORTED PUNITIVE DAMAGES CLAIM
      IN COUNT SEVEN MUST BE DISMISSED**

Count Seven of the Amended Complaint does not appear to assert a recognized cause of action under Connecticut law.  Instead, Dashiel merely alleges that PRERS' alleged conduct "was a wanton and willful violation of [her] rights."  (Am. Compl., ¶ 76.)  These allegations seem to suggest a claim for punitive damages, which also must fail.

Even if the Court denies Prudential's motion for summary judgment as to liability under Title VII, it should nevertheless dismiss Dashiel's purported demand for punitive damages because she has absolutely no evidence from which a jury could find that PRERS acted "willfully" or engaged in a discriminatory practice with "reckless indifference" to her federally protected rights, *or* that liability for such damages could be imputed to Prudential.  Kolstad v. American Dental Ass'n, 527 U.S. 526, 544-46 (1999) (if employer made "good faith efforts to comply" with anti-discrimination law, it "may not be vicariously liable" for punitive damages). Where, as here, "an employer has undertaken good faith efforts at Title VII compliance, it 'demonstrat[es] that it never acted in reckless disregard of federally protected rights.'"  Kolstad, 527 U.S. at 544 (citation omitted).  "This defense requires an employer to establish both that it has an antidiscrimination policy and has made good faith efforts to enforce it."  Zimmerman v. Associates First Capital Corp., 251 F. 3d 376, 385 (2d Cir. 2000).  Once this defense is established, a demand for punitive damages must be dismissed as a matter of law.  Id.

Here, Dashiel admits that she has no evidence of any discriminatory conduct or animus by the "sole" decision-maker – Kershaw – in this case.  (Def.'s 56(a)(1), ¶ 34.)  In fact, she does not even accuse Kershaw of discriminating against her.  (Id.)  Moreover, Prudential's equal employment and non-discrimination policies and complaint procedures demonstrate that it made

good-faith efforts to comply with Title VII. (Id., ¶¶ 42-43.)  Therefore, the Court should dismiss Count Seven and/or Dashiel's request for punitive damages.

## IV. CONCLUSION

For all of the foregoing reasons, the Court should grant Prudential's Rule 56 motion for summary judgment and dismiss Dashiel's Amended Complaint in its entirety; grant to Prudential its costs, including attorneys' fees, in connection with this motion; and grant to Prudential such other and further relief as the Court may deem just and proper.

Dated this 11th day of June 2004, at Newark, New Jersey.

Respectfully submitted,

PROSKAUER ROSE LLP

By Edward Cerasia II
   Edward Cerasia II
     Fed. Bar No. ct 13096
   Mary Elizabeth Deno
     Fed. Bar No. ct 24335
   One Newark Center, 18th Floor
   Newark, New Jersey 07102
   973.274.3200
   E-mail:  ecerasia@proskauer.com

Attorneys for Defendant
 The Prudential Insurance Company of America

Local Counsel:

Jonathan B. Orleans
  Fed. Bar No. ct 05440
ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
Bridgeport, Connecticut 06601
203.333.9441
E-mail:  jorleans@znclaw.com

32

## CERTIFICATION OF SERVICE

I hereby certify that on June 11, 2004, I caused to be served a true and correct copy of the foregoing Defendant's Memorandum of Law In Support Of Its Motion For Summary Judgment, by Federal Express Next Day Air, prepaid, on the following counsel of record for plaintiff:

Michael J. Melly, Esq.
Bartinik, Gianacoplos, Bartinik, Bartinik & Grater, P.C.
100 Fort Hill Road
Groton, CT  06340

Mary Elizabeth Deno