UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------x
PAULA DASHIEL,

        Plaintiff,

-against-

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

        Defendant.
------------------------------------------------x

Case No. 3:02-CV-01231 (CFD)

June 11, 2004

## DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure of this Court, defendant The Prudential Insurance Company of America ("Prudential") respectfully submits this statement of material facts as to which it contends there is no genuine issue to be tried.

1.    On September 7, 1999, Prudential Real Estate and Relocation Services ("PRERS"), then a division of Prudential,[1] hired plaintiff Paula Dashiel ("Dashiel"), who is African-American, as an International Services Coordinator ("ISC") for the PRERS international division in Shelton, Connecticut. (Deposition of Paula Dashiel ("Dashiel Dep.") at 13; Dashiel Dep. Ex. 1; Am. Compl., ¶ 7.)

2.    Dashiel worked as an ISC in Shelton until October 31, 2001, when her job was eliminated and her employment was terminated (along with over 400 other employees) in connection with the closing of the Shelton facility. (Dashiel Dep. at 13-14, 32, 46, 100-01; Dashiel Dep. Ex. 11; Declaration of Mari Johnson ("Johnson Decl."), ¶ 2.)

---

[1]    PRERS is currently a subsidiary of Prudential Financial, Inc. (Defendant's Answer and Affirmative Defenses, ¶ 8.)

3. Dashiel was hired as an at will employee, meaning that she or PRERS could "terminate the employment relationship at any time with or without cause, without prior notice." (Dashiel Dep. Ex. 3.) In the acceptance letter that Dashiel signed on September 7, 1999, she acknowledged that she was an "at will" employee: "I understand that my employment with Prudential Real Estate and Relocation Services is at will and either I or Prudential Real Estate and Relocation Services may terminate my employment at any time with or without reason and without prior notice." (Dashiel Dep. Ex. 1; Dashiel Dep. at 16-17.)

4. Dashiel also received Prudential's Employee Handbook, (Dashiel Dep. Ex. 2), which states:

> None of the company's policies, procedures or practices, whether expressed here or elsewhere, whether orally or in writing, are intended to create any promises or contractual rights of employment. This applies to privileges and benefits as well. Rather they are guidelines that are subject to change by the company in its sole discretion without prior notice, to the extent that is permissible by law.
>
> Your employment with the company is at will. This means that either you or the company may terminate the employment relationship at any time with or without cause, without prior notice.

(Dashiel Dep. Ex. 3, at p. 2.)

5. Between September 1999 and the end of her employment on October 31, 2001, no one at PRERS ever told Dashiel that she was guaranteed employment with PRERS for any specific period of time. (Dashiel Dep. at 20, 128-29.) Nor did she ever receive anything in writing from PRERS guaranteeing her employment for a specific period of time. (Id.)

6. As an ISC in the PRERS international division, Dashiel primarily "worked with [PRERS'] corporate clients to help their employees who were relocating overseas." (Dashiel Dep. at 22-23.) Her job function primarily involved "destination services." (Deposition of

2

Rosemary Moreno ("Moreno Dep.") at 44-45; Deposition of Debra Kershaw ("Kershaw Dep.") at 13.) Dashiel and Joan Schell ("Schell") were the only ISCs performing primarily destination services in the Shelton office. (Moreno Dep. at 35-37, 44-45, 57-58.)

7. In or around November 1999, PRERS announced a major reorganization, reporting that senior management had decided to consolidate and relocate the majority of PRERS' operations, including certain functions of its international operations, to a new facility in Phoenix, Arizona. (Dashiel Dep. at 44; Moreno Dep. at 8-9.) Specifically, management planned to transfer the destination services and visa and immigration components of PRERS' international operations to Phoenix, Arizona, and to consolidate the transportation services component of the international operations in PRERS' Valhalla, New York facility. (Moreno Dep. at 19-21; Kershaw Dep. at 42-45.)

8. By letter dated January 1, 2001, PRERS offered Dashiel, and other employees whose jobs were transferring, an opportunity to relocate to Phoenix, with the same job title. (Dashiel Dep. at 44; Dashiel Dep. Ex. 5.)

9. The January 1, 2001 letter expressly stated that PRERS' offer to transfer Dashiel did not alter her "at-will" employment relationship:

> This letter does not constitute an employment contract and does not guarantee your employment for any specific period of time. Your employment at Prudential continues to be at-will. This means that either you or the company may terminate your employment at any time without prior notice and with or without cause.

(Dashiel Dep. Ex. 5.)

10. The January 1, 2001 letter referred Dashiel to PRERS' Relocation Policy, which outlined the benefits and eligibility requirements for those employees who wanted to transfer to Phoenix. (Dashiel Dep. Ex. 7.) Specifically, an individual had to be a full-time employee by, or

3

have a written job offer dated on or before, March 31, 2000, in order to qualify for relocation to Phoenix. (Id.)

11.  By letter dated January 11, 2001, PRERS notified Dashiel that, due to a change in "business strategy," it was rescinding its offer to transfer Dashiel and other employees who performed similar international transportation functions to Phoenix. (Dashiel Dep. at 44-45; Dashiel Dep. Ex. 6.)

12.  The January 11, 2001 letter stated that PRERS had re-evaluated the circumstances and determined that it needed to consider other locations for possible transfer. (Dashiel Dep. Ex. 6.) The January 11, 2001 letter deemed the January 1, 2001 offer letter to Dashiel, (Dashiel Dep. Ex. 5), "null and void" and stated that once PRERS "finalized the business strategy, [it would then] communicate the next steps and where applicable distribute new offer letters." (Dashiel Dep. Ex. 6.)

13.  The January 11, 2001 letter to Dashiel does not contain any representation or promise that she would remain employed with PRERS for any specific period of time or that she would be transferred to a facility in New York or elsewhere. (Dashiel Dep. Ex. 6.)

14.  Dashiel was aware that the January 11, 2001 rescission letter also was sent "to people who performed jobs similar to or the same as [her]." (Dashiel Dep. at 45-46.)

15.  After Dashiel received the January 11, 2001 rescission letter, she understood that the terms and eligibility requirements for transferring outlined in the PRERS Relocation Policy no longer applied to her. (Dashiel Dep. at 48; Dashiel Dep. Ex. 7; Moreno Dep. at 71-74, 76.)

16.  In or about March 2001, PRERS notified Dashiel that it planned to eliminate the ISC position in Shelton (*i.e.*, the job she and Schell held) and that she and Schell, who is Caucasian, would be terminated when the Shelton facility closed in October 2001. (Dashiel Dep.

at 41, 46-47; Moreno Dep. at 37-38, 46-48; Kershaw Dep. at 10; Declaration of Edward Cerasia II, Esq. ("Cerasia Decl."), Ex. E (Response to Interrogatory No. 9).)

17. In or about March 2001, PRERS also informed Dashiel that only the transportation services component of its international operations was being transferred to the Valhalla facility and that those services were going to be handled by International Transportation Counselors ("ITCs") at that location. (Dashiel Dep. at 41, 46-47; Moreno Dep. at 37-38, 46-48; Kershaw Dep. at 10.)

18. Because Dashiel and Schell's primary job function was destination services – and not transportation services – neither was offered the option of automatically transferring to the ITC position in the Valhalla facility; but they both were offered the opportunity to "post[] for any other jobs in Valhalla if they wanted to." (Moreno Dep. at 36-38; see also Dashiel Dep. at 49-55, 58, 59-61, 63.)

19. All employees who wanted to transfer to Valhalla to work as an ITC had to apply for that position. (Kershaw Dep. at 27-28 ("[I]f you were not in Valhalla [during the relocation process] everyone was going to have to reapply for a job in Valhalla.").)

20. By year-end 2001, the Shelton facility closed. (Dashiel Dep. at 46; Moreno Dep. at 26; Johnson Decl., ¶ 2.) As a result of the closure of the Shelton facility, over 400 employees lost their jobs with PRERS. (Johnson Decl., ¶ 2.)

21. In or around March 2001, Mike Cazelet ("Cazelet"), then-Vice President of International Transportation, and Rosemary Moreno ("Moreno"), then-Director of Human Resources for the Shelton facility, asked Dashiel to apply for the ITC position in Valhalla. (Dashiel Dep. at 63.)

22. On April 16, 2001, Dashiel sent Cazelet and Deborah Kershaw ("Kershaw"), Manager of International Transportation in Valhalla, an e-mail stating that she was not interested in an ITC position in Valhalla: "[T]hank you for asking me to reapply for the (ISC) ITC position. However, after thinking I have decided that I am not interested in making a lateral move at this time...." (Dashiel Dep. at 63-64; Dashiel Dep. Ex. 10.)

23. Dashiel knew that her employment with PRERS would be terminated in October 2001, unless she secured another position within PRERS or Prudential by that time. (Dashiel Dep. at 62, 121.) As early as April 2001, it was Dashiel's "assumption" that she was "going to be let go." (Id. at 146.)

24. Dashiel's July 2001 mid-year performance review states that "[Dashiel] will be separating from the company upon the Shelton region closure, but [her] gained knowledge may benefit [her] career goal with another company." (Dashiel Dep. Ex. 14; Dashiel Dep. at 122-24.) The evaluation also reflected Dashiel's desire to pursue a degree in computer science "after Prudential." (Dashiel Dep. Ex. 14.) In Dashiel's attachment to her July 2001 performance evaluation, entitled "My comments to my mid year review," she did not rebut these statements; instead, she acknowledged her forthcoming "unfortunate separation" from Prudential. (Id.)

25. By letter dated August 31, 2001, Prudential formally notified Dashiel that, due to the previously announced reorganization, her job was being eliminated and that her employment would be terminated, effective October 31, 2001, if she did not secure another position with PRERS or Prudential:

> As you know, Prudential Real Estate Services is undergoing a reorganization . . . so that [it] can better serve its customers and operate more efficiently. As a result, your position is being eliminated. Therefore, you are being separated from employment effective October 31, 2001.

6

> Of course, you may post for positions both inside and outside of Prudential Real Estate and Relocation Services. If you unable to secure another position with Prudential, however, your separation from employment with Prudential will occur on October 31, 2001.

(Dashiel Dep. Ex. 11; Dashiel Dep. at 68-69.)

26.   In the August 31, 2001 letter, PRERS also informed Dashiel of her eligibility for a severance package and retention bonus. (Dashiel Dep. Ex. 11; Dashiel Dep. at 69-70.) Dashiel knew that to be eligible for the severance package or retention bonus she had to sign a Separation Agreement and General Release. (Dashiel Dep. at 69-70, 151-52, 189-90; Dashiel Dep. Ex. 11; Moreno Dep. at 55-56.) Dashiel never signed the Separation Agreement and General Release. (Dashiel Dep. at 70, 151-52.)

27.   As of late-2001, there were six ITC positions in the Valhalla office, which were filled by Annie Knotts (African-American), Priscilla Dabbs (African-American), Patricia Hardy (African-American), Sigal Reingold (Caucasian), Jan Kessler (Caucasian) and Ellen Shedlovsky (Caucasian). (Cerasia Decl., Ex. E (Response to Interrogatory No. 22) & Ex. F (Supp. Response to Interrogatory Nos. 5 and 22).)

28.   On October 5, 2001, Ellen Shedlovsky voluntarily left PRERS. (Johnson Decl., ¶ 3; Dashiel Dep. at 116-17.)

29.   On October 2, 2001, Dashiel applied for an open ITC position in the Valhalla office. (Dashiel Dep. Ex. 12; Dashiel Dep. at 70-71.) On October 3, 2001, Dashiel interviewed for the ITC position in Valhalla with Kershaw and Kim Fields ("Fields"), a human resources professional in Valhalla. (Dashiel Dep. at 65-66, 73; Kershaw Dep. at 29-30.)

30.   Kershaw, who is African-American, supervised all of the ITCs in the Valhalla facility and was the sole decision-maker with respect to who would receive job offers for any

7

open ITC position in Valhalla. (Kershaw Dep. at 30-31; Dashiel Dep. at 112, 117; Moreno Dep. at 28.)

31. Dashiel knew that the vacant ITC position in the Valhalla office reported directly to Kershaw. (Dashiel Dep. at 72.)

32. On October 3, 2001, after her interview with Kershaw and Fields, Dashiel sent them an e-mail, in which she voluntarily withdrew her application for the ITC job in the Valhalla office. (Dashiel Dep. at 77; Dashiel Dep. Ex. 13; Kershaw Dep. at 31-32; Am. Comp., ¶ 38.) Because Dashiel withdrew her application, Kershaw no longer considered Dashiel for the ITC position and did not offer her that job. (Kershaw Dep. at 31-32.)

33. It was "solely" Kershaw's decision not to hire Dashiel for the ITC job in Valhalla. (Kershaw Dep. at 30.) Kershaw did not speak with any PRERS or Prudential manager before she made that decision. (Id. at 29-33.)

34. In this case, Dashiel does not claim that Kershaw discriminated against her in any way or in connection with the termination of her employment with PRERS. (Dashiel Dep. at 78, 92-93.) Dashiel had a "[v]ery good" working relationship with Kershaw. (Id. at 72, 190.)

35. After Dashiel withdrew her application and took herself out of consideration for the ITC position in Valhalla, Kershaw hired Martha Bobian, who is African-American, for the vacant ITC position. (Kershaw Dep. at 52; Johnson Decl., ¶ 4.)

36. Because Dashiel did not successfully post for or obtain any other position within PRERS or Prudential, her employment was terminated effective October 31, 2001 (Dashiel Dep. at 62, 100-01; Dashiel Dep. Ex. 11; Kershaw Dep. at 30-32.)

37.    Schell, the other ISC in Shelton who performed job duties that were similar to Dashiel's duties, did not apply for any other position within PRERS or Prudential and, like Dashiel, was terminated from employment on October 31, 2001. (Moreno Dep. at 38.)

38.    During her employment, PRERS consistently treated Dashiel fairly and favorably by designating her as the primary contact for one if its key clients in 2000, and by giving her the highest annual pay increase she could receive in 2001. (Dashiel Dep. at 23-24, 87-89.)

39.    On September 18, 2001, through her former counsel, Dashiel filed a complaint of discrimination against Prudential with the Connecticut Commission On Human Rights ("CHRO"), which was dual-filed with the U. S. Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination in connection with the termination of her employment and failure to obtain another position with PRERS or Prudential. (Dashiel Dep., Ex. 15; Dashiel Dep. at 142.)

40.    On December 28, 2001, the CHRO dismissed Dashiel's CHRO complaint "for the reason that there is no reasonable possibility that further investigation will result in a reasonable cause finding." (Dashiel Dep. Ex. 16.)

41.    The EEOC adopted the CHRO's determination and, on April 23, 2002, issued Dashiel a Dismissal and Notice of Rights. (Cerasia Decl., Ex. G.)

42.    Prudential's Equal Employment and Affirmative Action policy states as follows:

> Prudential recruits, hires, trains, promotes, compensates and makes all other personnel decisions on the basis of merit without regard to race, color, creed, religion, age, gender, sexual orientation, marital status, pregnancy or pregnancy-related medical condition, national origin, physical or mental disability, citizenship status, military obligation, status as a disabled veteran or veteran of the Vietnam War, or on any other basis that is protected under applicable law.

(Dashiel Dep. Ex. 3, at p.8.)

43. Prudential's non-discrimination and anti-harassment policy states as follows:

> If you believe that you have been subjected to any form of prohibited harassment, or any form of prohibited discrimination by a supervisor, co-worker, customer, or client, you should immediately bring the matter to the attention of someone in a position of responsibility within your reporting chain, a Human Resources professional, the Prudential Equal Employment Opportunity office, or the company's Ethic's Hot Line.

(Dashiel Dep. Ex. 3; Dashiel Dep. at 141.)

44. During her employment with PRERS, Dashiel never complained about discrimination to any manager or human resource professional at PRERS or Prudential or through Prudential's Equal Opportunity Office or Ethics Hot Line. (Dashiel Dep. at 141-42.)

45. In or around July 2001, Dashiel interviewed with a prospective employer, Interconex, but Interconex did not offer her a job. (Dashiel Dep. at 127-32.). She does not recall having any other interviews or receiving any job offers from any prospective employer while she was employed by PRERS. (Id. at 132.)

Dated this 11th day of June 2004, at Newark, New Jersey.

Respectfully submitted,

PROSKAUER ROSE LLP

By *Edward Cerasia II*
Edward Cerasia II
Fed. Bar No. ct 13096
Mary Elizabeth Deno
Fed. Bar No. ct 24335
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
E-mail: ecerasia@proskauer.com
E-mail: mdeno@proskauer.com

Attorneys for Defendant
The Prudential Insurance Company of America

Local Counsel:

Jonathan B. Orleans
 Fed. Bar No. ct 05440
ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
Bridgeport, Connecticut 06601
203.333.9441
E-mail: jorleans@znclaw.com

## CERTIFICATION OF SERVICE

I hereby certify that on June 11, 2004, I caused to be served a true and correct copy of the foregoing Defendant's Local Rule 56(a)(1) Statement of Material Facts, by Federal Express Next Day Air, prepaid, on the following counsel of record for plaintiff:

> Michael J. Melly, Esq.
> Bartinik, Gianacoplos, Bartinik, Bartinik & Grater, P.C.
> 100 Fort Hill Road
> Groton, CT  06340

*Mary Elizabeth Deno*
Mary Elizabeth Deno