UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------x
: 
PAULA DASHIEL, :
:
           Plaintiff, :  Case No. 3:02-CV-01231 (CFD/TPS)
:
    -against- :
:
THE PRUDENTIAL INSURANCE :  January 13, 2005
COMPANY OF AMERICA, :
:
           Defendant. :
:
-------------------------------------------------------x

**DEFENDANT'S REPLY MEMORANDUM OF LAW IN**
**FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

PROSKAUER ROSE LLP
Edward Cerasia II
One Newark Center, 18th Floor
Newark, New Jersey 07101
973.274.3200

-and-

ZELDES, NEEDLE & COOPER, P.C.
Jonathan B. Orleans
1000 Lafayette Boulevard
Bridgeport, Connecticut 06601
203.333.9441

Attorneys for Defendant
The Prudential Insurance Company of America

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.  PRELIMINARY STATEMENT ..........................................................................1

II. ARGUMENT..........................................................................................................2

    A.  THE COURT LACKS JURISDICTION OVER DASHIEL'S NATIONAL ORIGIN DISCRIMINATION CLAIM..................................2

    B.  THERE IS NO EVIDENCE THAT PRERS'S ASSERTED LEGITIMATE, NON-DISCRIMINATORY REASONS FOR ITS ACTIONS ARE FALSE, OR THAT IT ACTED FOR DISCRIMINATORY REASONS............................................................3

        1.  KERSHAW'S BELIEF THAT DASHIEL WITHDREW HER APPLICATION FOR AN ITC POSITION WAS ENTIRELY REASONABLE......................................................3

        2.  THE TERMINATION OF OVER 400 EMPLOYEES WAS NOT A PRETEXT FOR DISCRIMINATION AGAINST DASHIEL ..................................................................................4

        3.  IN ORDER TO AVOID TERMINATION, DASHIEL HAD TO OBTAIN A NEW POSITION, BUT SHE FAILED TO DO SO ...................................................................5

        4.  THE DECISION TO CLOSE THE ENTIRE SHELTON FACILITY IS NOT AT ISSUE; THUS, THE IDENTITY OF THAT DECISIONMAKER IS IRRELEVANT .......................7

        5.  THE ALLEGED STRAY REMARK BY KATHY MORRIS, A NON-DECISIONMAKER, DOES NOT RAISE AN INFERENCE OF DISCRIMINATION.......................8

        6.  NO SIMILARLY-SITUATED, NON-AFRICAN-AMERICAN EMPLOYEE WAS TREATED MORE FAVORABLY THAN DASHIEL..................................................9

III. CONCLUSION.....................................................................................................10

# TABLE OF AUTHORITIES

## CASES

Butts v. City of New York Dep't of Hous. Preservation & Dev.,
    990 F.2d 1397 (2d Cir. 1993)..................................................................................2

Cameron v. Community Aid for Retarded Children, 335 F.3d 60 (2d Cir. 2003)..........................4

Ellis v. Provident Life & Accident Ins. Co., 926 F. Supp. 417 (S.D.N.Y. 1996),
    aff'd, 107 F.3d 2 (2d Cir. 1997) ...............................................................................8

Faldetta v. Lockheed Martin Corp., 98 Civ. 2614, 2000 WL 1682759 (S.D.N.Y.
    Nov. 9, 2000) ...........................................................................................................5

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14 (2d Cir. 1995) ...............................7

Leibforth v. Belvidere Nat'l Bank, 337 F.3d 931 (7th Cir. 2003).....................................................4

Parcinski v. Outlet Co., 673 F.2d 34 (2d Cir. 1982)........................................................................5

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).........................................................................8

Ungerleider v. Fleet Mortgage Group of Fleet Bank,
    329 F. Supp. 2d 343 (D. Conn. 2004).......................................................................8

Williams v. New Castle County, 970 F.2d 1260 (3d Cir. 1992).......................................................3

## I. **PRELIMINARY STATEMENT**

Defendant Prudential respectfully submits this reply memorandum of law in further support of its motion for summary judgment.[1] As demonstrated below and in Prudential's moving papers, Dashiel has failed to establish the existence of disputed issues of material fact with respect to her claim that she was discharged because of her race. Therefore, Prudential's motion should be granted.

Dashiel seeks to create issues of fact – where none genuinely exist – by mischaracterizing the record, relying upon mere denials of facts, and ignoring undisputed facts showing that her employment ended for legitimate reasons. Most significantly, other than her unsupported and self-serving denials, Dashiel has failed to point to any evidence to contradict the following dispositive and undisputed facts:

- In early-2001, Dashiel learned that her employment (along with the employment of over 400 other employees) would be terminated in October 2001, *unless* she found another job with PRERS or another Prudential business. (Def.'s 56(a)(1), ¶ 23; Pl.'s 56(a)(2), ¶ 23.)

- In April 2001, PRERS asked Dashiel to apply for an ITC job in Valhalla, but she declined, stating in writing that "I am not interested in making a lateral move at this time." (Def.'s 56(a)(1), ¶¶ 21-22; Pl.'s 56(a)(2), ¶¶ 21-22.)

- By letter dated August 31, 2001, PRERS formally advised Dashiel that her job in Shelton was being eliminated and that her employment would be terminated on October 31, 2001, if she did not secure another position with PRERS or Prudential. (Def.'s 56(a)(1), ¶ 25; Pl.'s 56(a)(2), ¶ 25.)

- In October 2001, Kershaw, who is African-American, made the decision not to select Dashiel for an open ITC position in Valhalla, because Dashiel advised Kershaw she was withdrawing her application, thereby taking herself out of consideration for that job. (Def.'s 56(a)(1), ¶¶ 29, 32, 35; Pl.'s 56(a)(2), ¶¶ 29, 35.)

---

[1] The abbreviated and capitalized terms used in this reply memorandum are defined in Prudential's moving brief.

- Because Dashiel did not successfully post for or obtain any other position within PRERS or Prudential, her employment was terminated effective October 31, 2001. (Def.'s 56(a)(1), ¶ 36; Pl.'s 56(a)(2), ¶ 36.)

- Dashiel admits that Kershaw did not discriminate against her in any way or in connection with the termination of her employment. (Def.'s 56(a)(1), ¶ 34; Pl.'s 56(a)(2), ¶ 34.)

- After Dashiel withdrew her application for the ITC job, Kershaw hired Bobian, who is African-American, for that job. (Def.'s 56(a)(1), ¶ 35; Pl.'s 56(a)(2), ¶ 35.)

- No similarly-situated, non-African-American employee was treated more favorably than Dashiel. (Def.'s 56(a)(1), ¶¶ 14, 16, 18-19, 36-37; Pl.'s 56(a)(2), ¶¶ 14, 18, 19, 37.)

Accordingly, summary judgment in Prudential's favor is warranted.[2]

## II. ARGUMENT

### A. THE COURT LACKS JURISDICTION OVER DASHIEL'S NATIONAL ORIGIN DISCRIMINATION CLAIM

The Amended Complaint asserts a claim for race discrimination only. (Am. Compl., ¶ 31.) In opposing summary judgment, however, Dashiel now claims that Prudential discriminated against her because of her "national origin." (Pl. Br. at 8-9.) Because Dashiel never filed an EEOC charge (or CHRO complaint) alleging national origin discrimination, (see Def.'s 56(a)(1), ¶ 39; Pl.'s 56(a)(2), ¶ 39), the Court lacks jurisdiction over that claim. E.g., Butts v. City of New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993). In addition, the Court should not permit Dashiel to use her opposition brief to substitute for allegations that do not appear in her

---

[2] While Dashiel's opposition brief asserts there are "ten" causes of action in the Amended Complaint, there are only seven. Contrary to Dashiel's representation, there is no claim under the Connecticut Fair Employment Practices Act or for negligent infliction of emotional distress in the Amended Complaint. Because Dashiel's arguments as to her common law claims do not raise issues requiring further response, Prudential refers to the legal arguments set forth in its moving brief regarding those claims.

2

Amended Complaint. See Williams v. New Castle County, 970 F.2d 1260, 1266 n.4 (3d Cir. 1992) (contention in opposition brief cannot substitute for allegation in a complaint).

B. **THERE IS NO EVIDENCE THAT PRERS'S ASSERTED LEGITIMATE, NON-DISCRIMINATORY REASONS FOR ITS ACTIONS ARE FALSE, OR THAT IT ACTED FOR DISCRIMINATORY REASONS**

Dashiel makes a number of arguments in a last-ditch effort to establish that Prudential's stated reasons for her failure to obtain an ITC position and her ultimate termination are merely pretextual and that race discrimination was the true motivating factor. Yet, none of Dashiel's purported "facts" show that PRERS's stated reasons for its decisions are false, much less that any decision was actually based on her race.

1. **Kershaw's Belief That Dashiel Withdrew Her Application for an ITC Position Was Entirely Reasonable**

Dashiel now argues that she did not intend to decline a job in Valhalla when she sent her October 3, 2001 e-mail to Kershaw and Fields, and that Kershaw misinterpreted her e-mail as a statement that she was withdrawing her application for the ITC job. (Pl. Br. at 5.) The undisputed facts, however, make plain that Kershaw reasonably concluded – as any reasonable jury would – that Dashiel was withdrawing her application for the ITC job in Valhalla. (E.g., Def.'s 56(a)(1), ¶¶ 22, 32, 35.)

Dashiel's October 3 e-mail stated in relevant part that "I've weighed the decision and concluded that I do not want to work with the group." (Def.'s 56(a)(1), ¶ 32.) Regardless of what Dashiel now claims she intended, the only relevant inquiry is whether Kershaw, the "sole" decision-maker with respect to the ITC job in Valhalla, actually believed that Dashiel was withdrawing from the application process. Kershaw testified that she understood from this e-mail that Dashiel was "taking herself out of the running." (Kershaw Dep. at 31-32; Def.'s 56(a)(1), ¶ 32.) Dashiel cannot point to any admissible

3

evidence showing that Kershaw did not honestly believe this to be the case, and she admits that Kershaw's actions were not motivated by discriminatory animus towards her. (Def.'s 56(a)(1), ¶ 34.) The reasonableness of Kershaw's belief is further supported by the fact that, in April 2001, Dashiel had stated that she was not interested in moving to Valhalla as an ITC. (Id., ¶ 22.) Thus, Dashiel's attempt to establish pretext must fail. See, e.g., Leibforth v. Belvidere Nat'l Bank, 337 F.3d 931, 933-34 (7th Cir. 2003) (affirming summary judgment dismissing discrimination claims, court concluded that plaintiff failed to prove pretext because the bank "*honestly believed*" that her retirement was imminent, and thus it reorganized its personnel around such retirement) (emphasis in original); Cameron v. Community Aid for Retarded Children, 335 F.3d 60, 65-66 (2d Cir. 2003) (affirming summary judgment in favor of defendants, who terminated plaintiff's employment after relying on, and believing as true, complaints about plaintiff's inability to perform her job, even though she disputed the accuracy of such complaints).

### 2. The Termination Of Over 400 Employees Was Not A Pretext For Discrimination Against Dashiel

Dashiel contends that PRERS's termination of over 400 employees in connection with the closing of the Shelton facility is a "mere pretext" for her termination and that those employees' positions were not actually eliminated. (Pl. Br. at 12.) These contentions are absurd.

In making her argument, Dashiel relies upon an April 24, 2001 notice to PRERS employees that she claims indicates that all associates in the ISC position who met eligibility requirements would receive offers for the same position in Phoenix. (Id. at 12.) But, her reliance on the April 24, 2001 memorandum is misplaced. It is clear that the job offer procedure set forth in that memorandum applied only to PRERS employees

who were in positions relocating *to Phoenix*. (Pl. Ex. 7, Document D000468.) Dashiel admits that, as of January 11, 2001, the PRERS Relocation Policy no longer applied to her, as she was no longer eligible to transfer to Phoenix. (Def.'s 56(a)(1) ¶ 15; Pl.'s 56(a)(2), ¶ 15.)

Further, it is well-settled that a reorganization of an employer's business and a resulting reduction in force is a legitimate, non-discriminatory reason for the termination of a plaintiff's employment. E.g., Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982) (finding that reorganization leading to elimination of plaintiff's position was business decision made on rational basis); Faldetta v. Lockheed Martin Corp., 98 Civ. 2614, 2000 WL 1682759, at *8 (S.D.N.Y. Nov. 9, 2000) (recognizing that reduction in force is valid non-discriminatory reason for discharge). Dashiel has not pointed to any evidence to support her preposterous assertion that over 400 other employees were terminated for the specific purpose of discriminating against *her* because of her race. Nor has she presented any competent evidence to dispute the sworn statement of a PRERS Human Resources Consultant that over 400 PRERS employees lost their jobs when the Shelton facility closed. (Johnson Decl., ¶ 2; Def.'s 56(a)(1), ¶ 2.) Indeed, in opposing summary judgment, Dashiel submitted a nine-page list identifying hundreds of Shelton employees who were terminated when the Shelton facility closed in 2001. (See Pl. Ex. 5.) Simply put, there is no merit to Dashiel's bald assertion that the closing of the Shelton facility and resulting termination of 400 employees was pretextual.

  3. **In Order To Avoid Termination, Dashiel Had To Obtain A New Position, But She Failed To Do So**

Dashiel's opposition brief goes on at length about how she could have performed transportation duties for PRERS as an ISC in Valhalla, and suggests that others were

5

permitted to transfer to Valhalla while she was not. (Pl. Br. at 13-16.) That argument, however, ignores and distorts the undisputed facts that Dashiel performed a combination of duties, that she was not treated differently than Schell (the only similarly-situated employee who performed the same job duties as Dashiel), and that Dashiel withdrew her application for the open Valhalla ITC job for which she had applied.

Dashiel admits that her primary duties (65%) were in destination services, rather than in the transportation services that were provided by the ITCs in Valhalla. (Pl. Br. at 13.) Therefore, she was not able to transfer automatically to an ITC position. (Def.'s 56(a)(1), ¶ 18.) The same was true for Schell, who is White and was the only other Shelton employee who performed the same job duties as Dashiel. (Declaration of Kathleen Morris ("Morris Decl."), ¶ 3; Def.'s 56(a)(1), ¶¶ 6, 18, 37.) Accordingly, Schell, like Dashiel, also was required to apply for an ITC position if she wanted to continue employment with PRERS. (Supplemental Declaration of Edward Cerasia II ("Cerasia Supp. Decl."), Ex. A.) Dashiel was always free to apply for such a position and, indeed, she was asked to do so as early as April 2001. (Def.'s 56(a)(1), ¶ 21.) Of her own volition, Dashiel *twice* declined to complete the application process for an open ITC position in Valhalla. (Id., ¶¶ 22, 32.) Consequently, her argument that she was capable of performing transportation duties is irrelevant (and undisputed) because she failed to meet the simple prerequisite of completing the application process. Thus, Dashiel's suggestion that she was somehow denied the opportunity to be an ITC in Valhalla is belied by the indisputable facts.

### 4. The Decision To Close The Entire Shelton Facility Is Not At Issue; Thus, The Identity Of That Decisionmaker Is Irrelevant

Dashiel further attempts to distract the Court from the material issues by asserting that there is a lack of information as to who decided to close the Shelton facility, eliminate positions in Shelton, and transfer job duties to Phoenix or Valhalla, and that the absence of such information somehow evidences a lack of credibility that should be construed against Prudential. (Pl. Br. at 21.) Contrary to Dashiel's contention, the identity of the person(s) who decided to close the Shelton facility, eliminate the positions of the 400 employees at that location, and transfer job duties is of no import to her discriminatory discharge claim in this case. Regardless of who determined to reorganize and eliminate the 400 jobs in Shelton, the indisputable fact remains that all those jobs were eliminated in Shelton, and, in light of her pending termination, Dashiel was required to find another position within PRERS or Prudential if she wished to remain employed by Prudential. (Def.'s 56(a)(1), ¶ 23.) Other employees had to do the same. (Id., ¶¶ 18, 37; Cerasia Supp. Decl., Ex. A.)

The only relevant inquiry is the identity of the decision-maker with respect to Dashiel's application for a new position that would have enabled her to continue her employment beyond October 31, 2001, and whether that person discriminated against her. It is undisputed that Kershaw was the "sole" decision-maker in that regard. (Def.'s 56(a)(1), ¶ 30.) Dashiel – who admits that Kershaw did *not* discriminate against her in any way – has failed to point to any admissible evidence that would cast doubt on these undisputed facts. (See Pl.'s 56(a)(2), ¶¶ 30, 33.) Dashiel's mere denial of these facts is insufficient to withstand summary judgment. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (a plaintiff cannot defeat summary judgment by

7

relying on "unsupported factual assertions . . . conjecture or surmise" or "'upon the mere allegations or denials of the adverse party's pleadings'") (citation omitted).

### 5. The Alleged Stray Remark By Kathy Morris, A Non-Decisionmaker, Does Not Raise an Inference of Discrimination

As "evidence" of purported discriminatory animus in connection with her discharge, Dashiel asserts that, on numerous occasions, her supervisor, Kathy Morris ("Morris"), told her that she could not attend client meetings because of her foreign accent. (Pl. Br. 27-28.) Morris, however, was not a decision-maker with respect to hiring for ITC positions in Valhalla or the termination of Dashiel's employment. (Morris Decl., ¶ 6.) Consequently, the alleged remark – assuming, *arguendo*, that they were made, which Prudential denies – cannot give rise to an inference of discrimination with respect to Dashiel's discriminatory discharge claim.

Kershaw alone decided who would receive an open ITC job in Valhalla. (Def.'s 56(a)(1), ¶ 30; Morris Decl., ¶ 6.) Dashiel even acknowledges that Morris was not involved in that decision. (Dashiel Dep. at 112.) Because Morris was not a decision-maker, any alleged stray remark by her are irrelevant to Dashiel's discriminatory discharge claim, and no inference of discrimination can be based on the alleged remark. E.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (inferences of discrimination may not be based on alleged discriminatory conduct by non-decision-makers); Ungerleider v. Fleet Mortgage Group of Fleet Bank, 329 F. Supp. 2d 343, 359 (D. Conn. 2004) (when individuals alleged to have made discriminatory remarks are not decision-makers, "the court affords their alleged remarks little weight"); Ellis v. Provident Life & Accident Ins. Co., 926 F. Supp. 417, 428 (S.D.N.Y. 1996) ("Inferences

of discrimination may not be based on 'statements by nondecisionmakers' ..."), aff'd, 107 F.3d 2 (2d Cir. 1997) (table).

### 6. No Similarly-Situated, Non-African-American Employee Was Treated More Favorably Than Dashiel

Dashiel takes issue with the fact that a number of new employees were hired in 2000 in the *new Phoenix* facility to perform destination services duties. (Pl. Br. at 21-23.) Any individuals who were already located in Arizona and hired to work there were clearly not similarly-situated to Dashiel. No inference of discrimination can arise from legitimate business decisions to hire local employees to staff the new facility in Phoenix, rather than to pay for the relocation of an employee from Shelton. While Dashiel obviously disagreed with that decision, she has presented no evidence that it was discriminatory – particularly since no ISC in Shelton relocated to Phoenix.

Dashiel further attempts to demonstrate pretext by alleging – with no factual support and contrary to the record – that another employee was offered an opportunity that she was denied. Dashiel asserts that Bret Wall, who is Caucasian, was a Shelton employee who was transferred to Phoenix after she was terminated and assumed her previous job responsibilities. (Pl. Br. at 11.) Simply stated, Dashiel is wrong. Wall was never a Shelton employee and was not hired for the purpose of assuming Dashiel's job duties. (Morris Decl., ¶ 5.) Rather, Wall, who lived in the Phoenix area, was hired in Phoenix in 2000 to be an International Assignment Manager at the Phoenix facility. (Id., ¶ 4.) PRERS sent Wall to Shelton for approximately three months of training, during which time PRERS provided him with temporary housing. (Id.) Upon completing that training, Wall returned to his home base in Arizona. (Id.) Indeed, in opposing Prudential's motion, Dashiel herself submitted a copy of a directory of the

9

International Services group, dated February 15, 2001, which shows that Wall was a "Phoenix" employee. (Pl. Ex. 24.)

Dashiel also identifies employees who allegedly held the ISC title and were transferred to Valhalla without applying for an ITC position, including Sigal Reingold, Ann Knotts, Priscilla Dabbs-Cooper, Barbara Meehan and Ellen Shedlovsky. (Pl. Br. at 19-20.) Dashiel's assertion is incorrect and is yet another example of the manner in which she has misrepresented the record. Reingold, who is Caucasian, did not transfer automatically to Valhalla; rather, Kershaw made the decision to approve her transfer, and had the option to disapprove it. (Pl. Ex. 23; Kershaw Dep. at 26-27.) Knotts, Dabbs-Cooper and Shedlovsky were *already* located in Valhalla, and Meehan was terminated when the Shelton facility closed. (Pl. Exs. 5, 24 & 29.) The Court should not permit Dashiel to avoid summary judgment by distorting the record.

### III. CONCLUSION

For all of the foregoing reasons, and the reasons set forth in Prudential's moving papers, the Court should grant Prudential's motion for summary judgment.

Respectfully submitted,

PROSKAUER ROSE LLP

By _Edward Cerasia II_
    Edward Cerasia II, Fed. Bar No. ct 13096
    One Newark Center, 18th Floor
    Newark, New Jersey 07102
    973.274.3200; E-mail: ecerasia@proskauer.com
    Attorneys for Defendant

Local Counsel:
Jonathan B. Orleans, Fed. Bar No. ct 05440
ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
Bridgeport, Connecticut 06601
203.333.9441; E-mail: jorleans@znclaw.com

## **CERTIFICATION OF SERVICE**

I hereby certify that on January 13, 2005, I caused to be served a true and correct copy of the foregoing Defendant's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, by overnight mail, prepaid, on the following counsel of record for plaintiff:

> Michael J. Melly, Esq.
> Mullins & Michaud LLC
> 682 Prospect Avenue
> Hartford, Ct  06105

_____
Edward Cerasia II